**Thomas E. GILMORE et al., Plaintiffs-Appellants,**

**v.**

**The GREENE COUNTY DEMOCRATIC PARTY EXECUTIVE COMMITTEE et al., Defendants-Appellees.**

**No. 27935.**

United States Court of Appeals, Fifth Circuit.

Nov. 24, 1970.

Oscar W. Adams, Jr., Birmingham, Ala., Norman C. Amaker, Jack Greenberg, James N. Finney, Fred L. Wallace, New York City, for plaintiffs-appellants.

Perry Hubbard, Hubbard & Waldrop, Tuscaloosa, Ala., for defendants-appellees.

Before TUTTLE, DYER and CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal from the United States District Court for the Northern District of Alabama which denied relief to the plaintiffs-appellants, who claimed that the denial to black illiterates of the right to use sample ballots at the polling places in a democratic primary election was a violation of the 1965 Voting Rights Act; that the failure to purge the voting list resulted in there being more white registered voters eligible to vote than there were white residents of the county; and that the method adopted by the voting officials denied to the illiterate black voters the right to a secret ballot, guaranteed by the State of Alabama, and assertedly guaranteed as a constitutional right.

The election involved here has long since passed. It was the county primary election for 1966, held soon after the en-

actment of the Voting Rights Act of 1965. It was an election approached with much interest by the black voters because of the fact that for the first time illiterates had been registered and thus were permitted to vote, and black residents of Greene County out-numbered white residents by approximately 81% to 19%. The failure of the black voters to carry the election for all of the black candidates seeking office naturally caused considerable disappointment and resulted in this litigation.

■ It is interesting to note that the first named plaintiff, Thomas Gilmore, has now been elected sheriff of the county—the office to which he aspired in 1966, and that other black residents, possibly among the other plaintiffs, have now been elected probate judge, coroner, and to the other county offices. To some extent, therefore, much of what the plaintiffs originally sought has now become moot. However, since the defendant county officials frankly stated in oral argument that they were equally interested with the plaintiffs in learning whether the procedures proven to have been followed violated the plaintiffs' constitutional rights, and since the complaint seeks a declaratory judgment, we proceed to consider the still open issues in the case.

■ The trial court granted approximately a year during which the plaintiffs were given ample opportunity to prove whatever facts bore upon the improper handling of the election procedures in Greene County. The record supports the trial court's findings that there was no evidence showing that any white person was permitted to vote who was not an actual registered voter or that more white persons voted than were properly registered.

The principal complaint that has survived the election deals with the conduct of the election under the direction of Judge J. Dennis Herndon, the county probate judge (now, in the 1970 election, to be succeeded by a black official), and particularly his refusal to let illiterate voters take sample ballots into the booth, rather than requiring them to direct poll officials the manner in which they wished their ballots to be marked. There is no proof that Judge Herndon treated black illiterates any differently than he treated white illiterates. It is undisputed that all illiterates were denied the right to take marked ballots or other lists with them to aid in their voting. Literate voters were not denied this privilege.

Appellants first argue that the refusal to permit black illiterates to use sample ballots was a violation of Section 5 of the 1965 Voting Rights Act, 42 U.S.C. § 1973c, because this was a procedure required to be used by an illiterate in casting his vote which was not in effect as of the effective date of the Voting Rights Act. Appellants argue this on the theory that illiterates were not permitted to vote at all prior to the Voting Rights Act, and any procedure adopted by Judge Herndon thereafter amounted to a change that required the prior approval of United States Attorney General or the United States District Court for the District of Columbia. The difficulty with this argument is that Alabama statutes expressly recognize the possibility that a "qualified elector" may be "unable to read" and it makes provision under such circumstances for him to be given assistance by two inspectors. See Title 17, Code of Alabama, Section 359. There is no proof that the denial to illiterates of the right to take sample ballots into the booth was any different prior to the adoption of the Voting Rights Act and the procedure followed by Judge Herndon. Thus, we agree with the appellees that the procedures were not such as were required by the Voting Rights Act to be approved by the Attorney General or the United States Court for the District of Columbia.

The actions of the managers of the several polling places, acting under the instructions of Judge Herndon, were, in some respects, unjustified under the

Alabama Statute.[1] The *improper conduct* referred to is the refusal of the managers at the polls to permit an illiterate to take a "sample ballot," whether it be written in the form of a ballot or merely a slip of paper with names on it, into the polling booth to assist him in casting his ballot. It appears from the record that some of the newly registered black voters wished to hand a list to the two persons designated to have their ballot marked in accordance with the written list. Instead of permitting this to be done, the practice was uniformly followed that one of the "assistants" read the names of the candidates and the office and the other entered the mark opposite the name which the voter said he wished to vote for. There was some contention made and some testimony to support it, which was not expressly denied, that some read in rapid and unintelligible manner and others that all of the names were read and the voter was required to remember the names and designate them for the marking of the ballot. We need not determine the correctness of this testimony, nor how widespread it may have been, if it occurred at all. There is nothing in the Alabama law which forbids a voter, whether literate or illiterate, to take a memorandum of names with him into the polling place to assist him in the marking of his ballot. Indeed, as is indicated above, it is undisputed that literate voters in Greene County were permitted to do so, but that illiterates were not.

The trial court, in its conclusions of law, seemed to consider that the issue here involved an effort to use something other than "official ballots" for voting. The court said

"The actions of some of the polling officials in denying the use of previously marked cards and sample ballots was proper. The elections in Alabama must be by official ballot only. See Title 17, § 165, which is mandatory," citing *Walker v. Junior,* 247 Ala. 342, 24 So.2d 431.

This, however, was not the problem raised by the action of the managers at the Greene County primary election.

There was no effort made by anyone to cast a ballot by using a prepared paper. The effort was simply to have the sample ballot used as an aid to cast the vote.

It is difficult to see how a voter, particularly an illiterate person who is casting his first ballot, could better perform the function as he wished than to have given careful consideration to the qualifications of the candidates and the choices he wished to make and then have a friend or other third person, write the list down in accordance with his choice, then take it to the polling place and hand it to the "inspectors" requesting that his ballot be prepared accordingly. Assuming that the "inspectors" carried out their function in accordance with their instructions from the voter, this would not differ from a literate voter making out a memorandum, which, in the case of a long ballot, may be absolutely necessary for even the most experienced voter, *and taking it with him and having it before him as he either marks his ballot or punches the card if he has a mechanical voting device.* Nevertheless, illiterates were not permitted to do this in the election here in question. Although we do not necessarily have to construe the Alabama statute, since it is clear that the statute does not *forbid* the use of a list or previously marked ballot, Section 359, cited above, is clearly susceptible of the construction that

---

1. Code of Alabama, Title 17, Section 359: "If a qualified elector is unable to read or is so physically disabled that he cannot make his cross mark on a ballot, and request (sic) assistance in preparing his ballot, the inspector shall swear him as to such disability, and thereupon no more nor less than two inspectors shall assist such voter by one of them in the presence of the other inspector, marking his ballot as he directs. Each elector in preparing his ballot shall prepare the same in the rooms or place where such election is being held, and not elsewhere."

the illiterate voter has the affirmative right to direct the "inspectors" to cast his ballot in the same manner as listed on a sheet of paper which he hands them. The language of the section is "thereupon [where there is an illiterate] no more nor less than two inspectors shall assist such voter by one of them in the presence of the other inspector, marking his ballot *as he directs.*" (Emphasis added.) It is difficult to see how this direction could not be given at the option of the voter by handling the inspector a written list of names and offices expressing the voter's wish.

■ In any event, there is here a clear discrimination between literate voters as a class and illiterate voters as a class, entirely without reference to the racial questions raised on this appeal. The appellees make no effort to demonstrate the reasonableness of the classification which gives literate voters a right which is denied to illiterates. As all know, a state statute or state action which grants to some what it denies to others, violates the equal protection provisions of the federal constitution, unless the deprivation is suffered as the result of the state's placing persons into different classes, and such classification is a reasonable one. Royster Guano Co. v. Virginia (1919) 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989. There being no provision of the Alabama statute which expressly seeks to draw this discriminating line between literates and illiterates, and thus no expressed state policy, and appellees having cited no basis for supporting the reasonableness of such discrimination, it appears clear that there was here a denial of equal protection to *all* illiterates voting in this primary. See the three-judge court decision in Garza v. Smith, W.D. Tex., 320 F.Supp. 131 (1970). While the trial court found as a fact that the means adopted by the officials responsible for conducting the election were not designed to discriminate against the plaintiffs or other black voters, this decision was based upon the court's finding that black illiterate voters were

treated in the same manner as were whites. The trial court did not address itself to the discrimination between literates and illiterates as such, although the court did say: "There are perhaps other ways by which more effective assistance could have been given to illiterate voters of both races in such election."

There is one basic principle, touching on the question of racial discrimination, which seems to have been overlooked by the trial court. That principle is that the courts recognize that there may be racial discrimination in fact even though it results from statutes, administrative rules or practices which, on their face, apply to all alike.

The trial court stated, "The court recognizes that this democratic primary election of May 3, 1966, was the first major election to be held in Greene County after the registration of large numbers of illiterate Negro voters pursuant to the provisions of the Voting Rights Act of 1964." This record also discloses that, under Alabama statutes, which had required literacy as a prerequisite to registration, the registration rolls contained a number of white voters in excess of one hundred percent of the eligible white persons in the county. (Obviously, largely due to the failure of the registrars to purge the list). Thus, it is clear that, at this particular election, any rule that deprived "illiterates" of a privilege granted to literates as a class "inevitably impose[d] a greater burden on Negroes than whites under existing dominant social patterns," and for this reason such conduct was "inherently discriminatory as applied." See United States v. Logue, (5th Cir., 1965) 344 F.2d 290, 292. Such situation the court must recognize is the "reality of * * * the segregated world." Brooks v. Beto, 366 F.2d 1, 12. (5th Cir., 1966).

■ Even if there appeared from this record to be a reasonable basis, or a compelling state interest, in drawing the distinction between the rights of illiterate and literate persons, without

regard to race (which we do not find) the standard of "reasonableness" when the racial realities are considered is markedly different. Then, "the Equal Protection and Due Process clauses of the Fourteenth Amendment command a more stringent standard." Jackson v. Godwin, (5th Cir., 1968) 400 F.2d 529. McLaughlin v. Florida, (1964) 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222.

It is, therefore, patent from the undisputed facts of record in this case that whatever disabilities were suffered by illiterates of Greene County by reason of the deprivation exercised by the poll managers, were suffered many times disproportionately by the black voters. If we were to assume that the Alabama statutes requiring literacy had been complied with up to the time of the passage of the Voting Rights Act of 1965, only black voters would be affected.[2]

■ While it is not necessary to go further with respect to the denial of equal protection of the laws by the disapproved conduct of the managers in this case, it is significant to note that the right here interfered with was a "voting right" which the courts have held to require the strictest protection against erosion. See Harper v. Virginia Board of Electors, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1965).

Dealing with the other issues raised on appeal, we conclude that there was ample evidence to support the findings of the trial court that there was no proof that any deceased person or persons who otherwise should have had their names purged from the voting list had been permitted to vote in the election.

■ We also agree that at this late date no injunctive relief should be granted. Moreover, the court notes that counsel for the appellees, in oral argument, made it clear that such declaration of the law as the court finds to be appropriate would be rigidly adhered to for the future. This court is justified in giving full credence to this undertaking in light of the fact that counsel for the appellees joined in suggesting that the court make such declaratory judgment as is required in light of the occurrences at the 1966 election.

In sum, the court makes a declaratory judgment, notwithstanding the passage of time, and the very substantial change in the official make-up of Greene County, because we conclude that the holding of the trial court that there was no discrimination in fact at the polling places should be set aside.

The judgment of the trial court dismissing the case is reversed and the case is remanded to the trial court for the entry of a declaratory judgment, declaring the right of the parties consistent with what is said herein. The parties will have an opportunity to present to the court any changes that are necessary in the alignment of parties in light of changes occurring since the filing of the complaint and the amendments thereto. It will also be appropriate for counsel to submit to the trial court proposed forms of judgment not inconsistent with what is said in this opinion.

**2.** In the trial court's findings of fact, it is stated: "In one box where seventy-five illiterate Negroes and two illiterate whites voted, the entire ballot was read to each such voter." This is the only evidence in the record as to the exact number of illiterate whites who participated in the election, although some witnesses testified that there were no illiterate whites in the boxes at which they presided. In such a situation, there can be no other conclusion drawn than that the practice was "inherently discriminatory as applied." United States v. Logue, *supra*, 344 F.2d 292. See also Ludley v. Board of Supervisors, La. State Univ., E.D.La., 150 F.Supp. 900, aff'd 252 F.2d 372 (5th Cir., 1958) cert. den. 258 U.S. 819, 79 S.Ct. 31, 3 L.Ed.2d 61.