Kermit JAMES et al., Plaintiffs,

v.

**HUMPHREYS COUNTY BOARD OF ELECTION COMMISSIONERS et al., Defendants.**

**No. GC 72–70–K.**

United States District Court,
N. D. Mississippi,
Greenville Division.
Oct. 4, 1974.

Conrad K. Harper, Joseph F. Dennin, New York City, Frank R. Parker, Jackson, Miss., for plaintiffs.

Richard M. Edmonson, Jackson, Miss., James T. Bridges, Belzoni, Miss., Thomas E. Childs, Jr., Asst. Atty Gen, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

On July 7, 1972, six black citizens of Humphreys County, Mississippi, filed this suit individually and as a class action on behalf of all black qualified and registered voters of the county and all black qualified candidates offering for county and district elective offices, seeking to set aside the general election held November 2, 1971, secure a new election, and obtain equitable relief for future elections.[1] By their second amended complaint filed November 2, 1973, plaintiffs charged that various acts of pervasive racial discrimination by county election officials in the manner of conducting the election invalidated the entire electoral process. Federal jurisdiction is invoked under several acts of Congress and constitutional provisions cited below.[2] Joined as defendants were the members of the county board of election commissioners, the circuit clerk and registrar, various other county officers, candidates and election officials, and also the State's Governor, Secretary of State and Attorney General, sued as members of the State Board of Election Commissioners.[3]

The general election held November 2, 1971, in Humphreys County was first drawn into litigation in this court by an action filed December 28, 1971, styled United States of America v. Humphreys County Board of Election Commissioners, et al., No. GC 71–141–K. That action challenged the decision of some county election officials to reject entirely a total of 714 ballots where the voters' choice was clear in one or more contests on the ballot, yet unclear in one or more other contests. The decision of the election managers to reject these ballots was adopted by the county election commissioners, who accordingly certified the results of the contested races to the state election officials. After the suit by the government, however, the county election commissioners, on June 8, 1972, did count the rejected ballots for all contests where the voters' choice was clear and certified the new results to the state officials. The revised totals did

---

1. Plaintiffs' class action is in two aspects: Class A, represented by six black voters, consists of all black qualified and registered voters in the county who voted in the general election; and Class B, represented by Kermit James, an independent candidate for supervisor, William Croft, an independent candidate for Chancery Clerk, and James A. Hart, an independent candidate for tax assessor and collector, consists of all black citizens qualified as independent candidates running for elective office in the November 2, 1971, general election or blacks who are qualified and intend to run for elective office in future county elections. The court determines that the case is properly maintainable as a class action under Rule 23, F.R.Civ.P.

2. The 1965 Voting Rights Act, as amended (42 U.S.C. §§ 1971, 1973, 1973i and 1973j); the 1866 Civil Rights Act (42 U.S.C. § 1981);

the 1871 Civil Rights Act (42 U.S.C. §§ 1983 and 1985); as well as the Thirteenth, Fourteenth and Fifteenth Amendments and 28 U.S.C. §§ 1343(3) and (4).

3. The court dismissed R. D. Bearden, Jr., and H. C. Switzer as defendants on procedural grounds, and reserved for decision the dismissal of other defendants nominees of the Democratic Party who were elected without opposition. The court now holds that the joinder of defendants who were unopposed candidates for public office in the general election was improper since plaintiffs do not claim that black candidates were denied the right to run for office or obtain a position on the ballot. Hence, no claim for relief was either alleged or proved against the unopposed candidates, who are herewith dismissed from the action.

not affect the outcome of any race. All blacks appearing on the ballot as independent candidates lost to white nominees of the Mississippi Democratic Party.

Thereafter, on December 28, 1973, a consent order was entered in GC 71–141–K enjoining the county election officials to count properly the ballots cast in all future elections. The consent order mandated the counting of votes cast for each office where the voter's choice is clear, even though the ballot is unclearly marked for other offices. The court retained jurisdiction to review compliance with its order and to issue directions appropriate to the enforcement of the judgment. Prior to the entry of this order, the court had consolidated the cases brought by the government and the private plaintiffs for a single hearing and disposition. Upon entry of the consent order, however, the United States withdrew from further participation in the proceedings, and the case went to full evidentiary hearing on the issues of racial discrimination broadly raised by the private plaintiffs.

The evidentiary hearing was extensive, and both sides offered voluminous and burdensome evidence consisting of live testimony from various witnesses, many depositions, reports and other documentary material. After considering this mass of sharply conflicting evidence and briefs of counsel, the court now makes a merits determination of the case, incorporating herein special findings of fact and conclusions of law as required by Rule 52, F.R.Civ.P.

An understanding of this case may be facilitated by reciting, at the outset, the claims of election irregularity made by the plaintiffs, to wit:

1. Election officials failed to count 714 ballots properly, as established by the government in its related action.

2. Poll watchers for blacks running as independent candidates were unlawfully excluded from certain polling places for various periods of time during the day of election.

3. Poll watchers for certain black candidates, at several election precincts, were either assaulted, physically abused, or threatened with bodily harm.

4. Illiterate black voters who cast ballots were either refused assistance in voting by election officials, or received misleading assistance; they also were denied the right to choose their own assistant, a privilege granted to disabled or blind voters.

5. The public, certain black candidates, and their poll watchers were excluded from the count of the ballots after the election.

6. The polling places at some boxes were established in buildings which were under the control of white incumbent candidates or which had an anti-Negro reputation, thus unfairly affecting the free expression of black voters.

Defendants deny the factual and legal bases of each claim, other than the first stated ground, which they contend has been adequately disposed of in the government's suit.

## BACKGROUND FACTS

### (a) GENERAL.

According to the 1970 census, Humphreys County has a population of 14,-601, a majority of whom are black (9,-512 blacks, 5,089 whites). The county has a history of opposing voting rights for black citizens, and prior to the adoption of the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq., very few, if any, blacks were registered to vote. Humphreys County was designated as an examiner county on September 24, 1965, and federal observers have been sent to the county on at least three prior occasions: November 1966, August 1967 and June 1968. By March 31, 1971, 2,083 of the non-white voting age population of 4,294 had been registered to vote, while 2,824 of the white voting

age population of 3,001 were registered voters. A majority of the newly registered black voters were placed on the rolls by federal examiners, and not by G. H. Hood, the county registrar, who was unenthusiastic about registering black voters and generally uncooperative with the federal officials. Voter registration drives among both blacks and whites continued throughout the spring and summer months. As of November 2 the total registered voters, by precincts, were as follows:

| Precinct | Number |
| --- | --- |
| Belzoni | 3638 |
| Four-Mile | 145 |
| Gooden Lake | 288 |
| Isola | 999 |
| Silver City | 686 |
| Lake City | 130 |
| Putnam | 413 |
| Midnight | 271 |
| Louise | 936 |

Although records of registration figures by race at the time of the general election were not kept, and hence such data is unascertainable, it is likely that some precincts, if not the county as a whole, had a majority of black registered voters.

Black citizens made various allegations to the Department of Justice of racial discrimination by Hood and by the election officials who conducted the August 1971 Democratic primaries, in which black voters, many of whom were illiterate, had participated. These charges were investigated by Peter Mear, a Department of Justice attorney, who visited the county throughout the July–November period. After checking reports on the August 3rd primary, notably a complaint by a white candidate concerning the kind of assistance extended to illiterate voters, Mear recommended to his superiors that federal observers be assigned to the Silver City precinct at the August 24th run-off primary. Six federal observers were assigned to this single precinct; the primary election went off smoothly and without any problems.

In the course of his continuing investigation, Mear, in October, was informed that substantially the same election officials who had conducted previous primary and general elections would serve at the forthcoming general election. Mear recommended to the Department of Justice that on election day federal observers be assigned to the polling places of each precinct throughout the county. In making this recommendation, Mear was cognizant of certain existing circumstances, namely: (1) Eleven black candidates for various county and district offices had legally qualified to run as independents and their names would appear on the ballot principally in contest with white nominees of the Democratic Party; this was in sharp contrast to the August primary ballot which had contained no black candidates; (2) blacks for the first time in the county's history had registered in substantial numbers, and probably had an edge over whites in registration; (3) four precincts (Four-Mile, Gooden Lake, Isola and Putnam) with admittedly heavy black majorities, never had in past elections, nor would they have on November 2nd, black election officials on duty; and (4) many blacks were fearful of interference by white election officials with the exercise of free choice by black voters, especiallly since illiterate blacks, many voting for the first time, would require assistance in marking their ballot.

(b) ASSIGNMENT OF FEDERAL OBSERVERS.

The Department of Justice acted favorably upon Mear's recommendation and decided to assign thirty federal observers throughout the county on election day. These observers, drawn from various federal agencies, had extensive experience in observing prior elections in Mississippi and elsewhere. Before election day, the assigned observers received oral or written instructions from their leaders as well as Department of

Justice officials as to the operation and effect of the state and federal election laws. The observers were qualified and competent to observe and accurately report the election procedures at each polling place. In accordance with a predetermined plan, the federal observers were stationed at each of the nine election precincts which had been established for many years. The number of boxes (18) and location of polling places in each supervisor's beat are described below.[4]

In advance of the election, the county election commissioners selected a total of 91 white and 30 black managers, clerks and bailiffs to run the election at the different polling places. These persons were county residents and usually known to voters in the locality of the polling places. Black and white officials were chosen to work at 14 polling places; white officials only were selected at Four-Mile, Gooden Lake and the two Isola boxes. The several duties of the chosen election officials, both black and white, varied at each polling place; however, black officials were expressly charged with the responsibility of providing assistance to blind, disabled and illiterate voters at no less than 9 polling places.[5]

## (c) POLL WATCHER PROBLEM.

Black candidates had gained ballot position for the general election not only in Humphreys but in other Mississippi counties, including a state-wide slate, notably consisting of James Charles Evers, black candidate for Governor, Freddie Washington, Jr., black candidate for Secretary of State, and C. J. Duckworth, black candidate for State Superintendent of Education. Still other blacks were offering for multi-county district posts. Political forces supporting black candidates who had qualified, by individual petitions, to get on the ballot became concerned about the availability of poll watchers, or challengers, representing independent candidates at the polls. The large number of candidates qualifying to run as independents was unprecedented in the state's recent history. By the practice and understanding consistently adhered to in Humphreys County and elsewhere in Mississippi, the election laws applicable to a general election permitted two challengers selected by each political party to be present at the polls to detect and challenge illegal voters.[6] On November 1, the day before the election, A. F. Summer, Mississippi's Attorney General, met with

4. Beat 1 (9 boxes) —Belzoni—7 boxes at County Courthouse
 Four-Mile—1 box at Four-Mile Store
 Gooden Lake—1 box at Gooden Lake Mitchell's Store
 Beat 2 (2 boxes) —Isola—2 boxes at Isola Town Hall
 Beat 3 (3 boxes) —Silver City—2 boxes at County Building
 Lake City—1 box at Community House
 Beat 4 (1 box) —Putnam—1 box in house adjacent to Delta Grocery Store
 Beat 5 (3 boxes) —Midnight—1 box at Seward-Harris Building
 Louise—2 boxes at Gill's Service Station

---

5. Black assistance was available at all but one of the seven Belzoni boxes, at both Silver City boxes, and at Louise Box 1.

6. The sole Mississippi statute on poll watchers is Miss.Code § 3248, now § 23-5-109 (1972), which provides in relevant part:
 "A space thirty feet in every direction from the polls, or the room in which the election is held, shall be kept open and clear of all persons except the election officers and two challengers of good conduct and behavior, *se-*

*lected by each party* to detect and challenge illegal voters . . . ." (Emphasis added).

This statute, when read in conjunction with § 3260 (§ 23-5-133, Code of 1972), appears to contemplate that challengers are recognized only for political parties. By § 3260, the ballot at the general election may contain only (a) the names of all candidates "who have been put in nomination, not less than forty (40) days previous to the day of the

attorney-representatives of Charles Evers and other independent candidates about the prospect of having poll watchers at the polls throughout the state to represent independent candidates. Summer in that conference expressed the informal opinion that he would not object to the independents being considered as a political party and the election would not be invalidated by allowing them two challengers at the polling places. Summer, however, declined to notify election officials that under the special circumstances poll watchers might be allowed for the independent candidates without vitiating the election; Summer's reasoning was that he was not authorized by state law, in the absence of a written inquiry from county election officials or other legally designated person, to issue a formal opinion. The election officials in Humphreys County thus received no notice prior to November 2 about any suggested change in the established practice of allowing poll watchers at the polls to represent only candidates nominated by a political party. The previous instructions issued by the county election officials to exclude from the polls all other persons, including those appearing as challengers or poll watchers for one or more individual independent candidates, were not withdrawn.

Summer, later testifying at trial, emphasized his view that permitting two poll watchers for independent candidates was merely a matter within the discretion of local election officials, and not legally required. Summer also affirmed that to notify the election officials of the state's 82 counties that they might lawfully exercise this latitude, an interpretation first expressed just one day before the election, would have presented an intolerable burden upon his office.

## EVENTS ON ELECTION DAY

### (a) PRESENCE OF FEDERAL OBSERVERS; VOTING PROCEDURES AND COUNTING OF BALLOTS.

██ When the polls opened at 7 a. m., 15 2-man teams of federal observers were present at the several polling places; they remained there throughout the day, including the period of vote counting. These observers, under the direction of two United States Civil Service Commission investigators, Gerald Knighton as captain, and Robert Spycher as co-captain, had direct access to the voting at each polling place and witnessed all aspects of the balloting, including the occurrence of any unusual incidents, which they recorded on official report forms. One of the principal functions of the federal observers was to closely watch the assistance given by election officials to voters who, whether blind, disabled or illiterate, needed help in marking their ballots. All assisted voters were individually identified by the observers, who contemporaneously noted on their records whether or not the observer could ascertain that the ballot was in fact, marked according to the voter's choice. The federal observers, of course, refrained from giving advice to the poll officials on how to conduct the election, nor did they in any way interfere with the actions of the election managers. Throughout election day, Knighton or Spycher, often in company with Mear, the Department of Justice attorney, visited each polling place at least twice; they kept in touch with the progress of the election at all precincts. Mear also main-

political party", (b) the "name of any candidate in the election, by the primary election of any date who, not having been nominated by a political party, shall have been requested to be a candidate for any office by a petition filed . . . not less than forty (40) days prior to the election" and signed by the number of qualified electors statutorily specified for the various offices. § 3260 further provides that the candidates selected by a political party shall be listed under the name of such party and any candidate qualifying as an independent shall be listed thereon as an independent. We emphasize that each of the 11 black candidates in Humphreys County had gained ballot position through the petition route.

tained an office at Belzoni, where he received various reports by telephone almost immediately upon the happening of unusual events occurring at any box. The day after the election, Mear instructed the federal observers concerning their continuing duties, and caused each team to file detailed reports of their observations.[7] At the general election, ballots were distributed to 5427 voters. Of the votes counted, 795 ballots were ascertained by federal observers to be ballots marked with assistance by the election officials. All qualified voters who arrived at the polls were given a ballot, and none was precluded from voting. Indeed, only seven challenges were made to persons who offered to vote. During the count after the polls were closed, the federal observers at some boxes noted that an unusually large number of ballots was wholly rejected where the voter's choice was clear for some offices, yet unclear for one or more offices; this impropriety in counting led to the government's action against the county election commissioners.[8] These ballots were rejected without overtones of racial discrimination as ballots for both white and black candidates were disregarded. The election results for the 11 posts on the Humphreys County ballot, as first determined by the original count on November 2 and later by the recount on June 8, 1972, are stipulated by the parties (Schedules A and A–1, Plaintiffs' Ex. 63). Plaintiffs readily concede that the black candidates stood defeated when all votes were correctly tabulated in the recount.

7. These reports, to be later discussed in more detail, disclosed the name and race of all persons permitted to vote, the name and race of each voter requiring assistance, together with the reason therefor; and records were also kept of the ballot counting as well as any untoward or unusual incidents occurring at the polls.

8. The complete rejection of an entire ballot because of improper marking for one or more offices is, of course, contrary to Mississippi law. Miss.Code § 3270 (§ 23–5–153), provides in relevant part:

## (b) POLL WATCHERS FOR INDEPENDENT CANDIDATES.

Two days before the election, several black attorneys from the New York area, namely: Milton Richardson, Napoleon Williams, Robbie Dix III and Ralph Accoo, in company with a group of students from eastern universities, arrived in Mississippi to act as poll watchers in Humphreys County for the independent candidates. Richardson was to direct their activities. The day before the election, Richardson and his group met in Belzoni with the local independent black candidates and made plans to assign poll watchers at each polling place. Richardson, having been informed of the outcome of the conference with the Attorney General in Jackson, advised his workers that they would be permitted in the polls, by pairs, upon presentation of individual authorizations from independent candidates. At this meeting, authorizations in favor of "the bearer" were executed and distributed to Richardson's workers.

When the polls opened, however, the election managers at most precincts refused to admit poll watchers for the independent candidates and required that they stand back at least 30 feet from the polling place. Some managers threatened arrest if the would-be poll watchers failed to comply with their instructions. Richardson immediately contacted Hood for clarification; Hood referred him to James T. Bridges, a Belzoni attorney, who was both Hood's personal counsel and special legal advisor to the county election commission. When Richardson

"[I]f for any reason it be impossible to determine from the ballot the voter's choice for any office voted for, his ballot so cast shall not be counted *for that office*." (Emphasis added).

In Tedder v. Board of Supervisors of Bolivar County, 214 Miss. 717, 59 So.2d 329 (1952), the Supreme Court of Mississippi held that under this statute a ballot is spoiled only where it is impossible to determine from the ballot the voter's choice. Obviously, where the voter's choice was clear in one or more contests, it should have been so counted for those offices, irrespective of unclear markings on the same ballot for other offices.

notified Bridges of the Attorney General's advice given the previous day, Bridges undertook to confirm this information by long distance call to the Attorney General's office. By 9 a. m. he obtained confirmation from an assistant attorney general. Hood was at once advised by Bridges that poll watchers for the independent candidates might enter the polls, and the election managers throughout the county should be so notified. Hood passed these instructions on to the election managers. As a result, poll watchers or challengers for the independent candidates were allowed in the polling place for the Belzoni boxes shortly after 9 a. m.; by 10 a. m. they were admitted at some outlying precincts, and by 11 a. m. they were permitted to enter the remaining polling places. Once inside the polls, the independent poll watchers remained there throughout the day and were present during the counting of the ballots. Although the poll watchers were sharply critical of the demeanor and actions of some election managers at the polls, they presented no challenge to anyone as an illegal voter, nor have plaintiffs offered any evidence that unauthorized votes were cast at any polling place.

(c) INCIDENTS OCCURRING TO POLL WATCHERS FOR INDEPENDENT CANDIDATES.

After the Richardson group was admitted as poll watchers, verbal exchanges occurred at several precincts between certain election officials and poll watchers. The evidence shows highly conflicting and frequently exaggerated accounts of what transpired, particularly at some of the outlying precincts. Profanity and epithets did pass between the officials and the out-of-state persons. In some cases, the managers were provoked either by gratuitous remarks of the poll watchers or by conduct in excess of their function as challengers. In other instances, the election managers were openly resentful of the presence of the poll watchers. Yet, once Hood's instructions were received, they did not deny them access to the polls or at the counting.

Three instances of physical abuse—two at Isola, one at Putnam—occurred to the black attorneys, Richardson, Williams and Dix. Richardson, as he was leaving Isola Box 2, after routinely checking with his poll watchers inside, was pushed from behind by two election managers, Bearden and Harper. Richardson said that the officials uttered racial slurs as they ejected him from the polls, and that black voters present witnessed the incident. The managers claim that Richardson's presence inside the polls was improper since the independents had two challengers on duty. Later, when entering the Isola polling place, Williams was grabbed by the election bailiff and another person and forced outside the building. Racial slurs were uttered against blacks. Williams appealed to Bearden, who permitted him to reenter the polling place where he remained as a poll watcher. At Putnam, Dix was physically assaulted while watching the vote tally. While sitting on a crate, he was rudely knocked to the floor, with injury to his head and teeth. Dix's assailant was a white man who was intoxicated and had no election responsibility; this person was removed from the tally room, arrested, and placed in jail by a deputy sheriff.

Despite the occasional verbal altercations and isolated acts of physical abuse involving poll watchers, as above noted, the election was conducted in a veritable fishbowl, within the presence and full view of federal observers; and, from the credible evidence, the election was unattended by harassment, intimidation, or coercion directed at the black citizens of Humphreys County who sought to vote in the election.

(d) LOCATION OF POLLING PLACES; PUBLIC COUNT OF BALLOTS.

The polling places at each of the election precincts were, as previously noted, at established locations which had existed for many years prior to the general election. No request was made to the county election officials, in advance of the election, to change any polling place, although

it was known that at Midnight the balloting was to be conducted in a building owned by Robert Harris, the incumbent white candidate for Beat Five Supervisor. The credible evidence, however, is that black voters were not handicapped in voting, or in any case denied the right to vote, or otherwise unfairly treated at the Midnight box.[9] The same conclusion is reached from the heavy turnout of voters at the two Louise boxes, despite subjective feelings expressed by some blacks that Gills Service Station had, among the black community, an unsavory reputation.[10]

Contrary to plaintiffs' assertion, the election managers, following the close of the polls, publicly opened the boxes and counted the ballots.[11] The required procedure for a public count was followed at each of the polling places, always in the presence of the federal observers and poll watchers. The election managers at some of the outlying precincts, because of the limited space available in the rooms where the tallying took place, found it necessary to exclude some spectators who had no official connection with the counting process. These steps were deemed by the election officials as reasonably necessary to avoid confusion and to maintain order and decorum in the tallying of votes.

### (e) ASSISTANCE TO VOTERS.

A critical issue in the case relates to the assistance afforded black illiterate voters at the polls. Certain facts are established without serious dispute. 795 ballots cast in the election were marked with assistance, which was usually furnished by the election officials. There were three categories of assisted voters, i. e., blind, disabled, and illiterate. The number of blind and disabled assisted voters did not exceed 86, only 17 of whom were black. Although blind and disabled voters of both races might select a person other than an election official to assist them in voting, few did so; and election officials largely rendered such assistance. There were 709 assisted illiterate voters, of whom 624, the overwhelming majority, were black. Although many black illiterates obtained assistance from black election officials, the majority of the black illiterates were assisted by white officials. No illiterates, of either race, were allowed to have outside assistance. Federal observers witnessed at least 634 (or about 80%) of all assisted voters as their ballots were being read to and marked for them; they did not observe the remaining 161 assisted voters, the majority of whom were black illiterates. By their reports, the federal observers identified, by name and race, each assisted voter who was observed and each assisted voter who was not observed. Appended as Exhibit "A" is a pertinent summary of the federal observers' reports disclosing, verbatim, the method by which such assistance was rendered at each box.[11A]

There were several reasons why the federal observers failed to observe every assisted voter. First, some assisted voters, of both races, declined to be so observed. Second, during periods of heavy voting, many assisted voters, of both races, voted simultaneously at a polling place with several boxes, like Belzoni. Not all could be physically observed by the observers available. Third, federal observers at several outlying polling places were at first prevented from ef-

9. Of the 271 registered voters at Midnight, 198 or 73% appeared at the polls and received ballots.

10. Of the 936 registered voters at Louise, 674 or 72% participated in the election.

11. State law, Miss.Code Ann. § 3267 (now § 23-5-147, Code of 1972), provides for a public count in these words:

"And when the polls shall be closed, the managers shall publicly open the box, and count the ballots, at the same time reading aloud the names of the persons voted for, which shall be taken down by the clerk in the presence of the managers. . . ."

11A. Deleted for publication purposes.

fectively observing approximately 40 assisted voters of both races.[12]

Plaintiffs offered testimony from various witnesses in an effort to show that certain white officials either refused to give assistance, or they gave misleading or partial advice to illiterate black voters, or they failed to mark some ballots in accordance with the voter's choice. These witnesses were flatly contradicted by election officials of both races who testified that they gave assistance whenever needed, fairly ascertained the voter's preference and marked the ballot accordingly. It is impossible for the court to satisfactorily resolve many irreconcilable evidentiary disputes without resort to the federal observers' reports. These reports, 18 in number, were compiled by disinterested persons almost immediately following the election; they were submitted in the regular course of official duty and are regarded as highly credible. From these reports it may be definitely ascertained that in each of the 634 cases where federal observers saw the assistance given to those voters, the ballot was, in fact, marked in accordance with the voter's choice. In no instance did a federal observer detect that an assisted voter's ballot was mismarked, or that misleading advice or partial information was given to any assisted voter by an election official. The observers record no instance of an election official refusing to aid a voter needing assistance. From these established facts, it is rea-

sonable to infer that the voters needing assistance but whose ballots were not observed (which occurred in no more than 161 instances in 18 boxes scattered throughout the county) were honestly and fairly dealt with by the polling place officials, and their ballots, too, were properly marked to reflect the choice of the voters. Any contrary conclusion, which contradicts the basic findings of the federal observers, is without credible evidentiary support and must be rejected as inconsistent with the plainly established facts.

## CONCLUSIONS OF LAW

(a) LEGAL PRINCIPLES APPLICABLE TO SETTING ASIDE A STATE ELECTION.

 We first consider plaintiffs' contention that the Humphreys County election for 11 contested county and district offices should be set aside and a new election ordered. Admittedly, relief of that nature is drastic, if not staggering to the community's vital interest in stable elections; and federal courts should exercise guardedly the power to overturn a state election. Bell v. Southwell, 376 F.2d 659 (5 Cir. 1967). The constitution surely does not require elections which are devoid of error, and "not every unconstitutional racial discrimination necessarily permits or requires a retrospective voiding of the election." Bell at 662. Even where the electoral process may be shown to be substantially

12. This occurred at three boxes under the following circumstances: (1) At Isola Box 2, manager Bearden told the federal observers that they could not observe the balloting unless the assisted voter made a specific request for observation. This, of course, violated the approved procedure which required election officials to announce to all voters needing assistance that a federal observer was present and that he would observe the marking of their ballots unless the assisted voter interposed objection. Bearden lifted his restriction after a conference at 9:40 a. m. with Gerald Knighton, the observers' captain. Federal observers were thus unable to observe 25 out of 39 assisted voters at this box. (2) At Silver City Box 2, Mrs. Catherine Reed, the election manager, also refused to announce to assisted voters that federal observers were present and might enter the booth with them. This procedure continued until approximately noon when Mrs. Reed was instructed by Hood to follow the acceptable procedure. Thereafter, she scrupulously complied with the procedure of announcing to assisted voters the presence of the federal observers and stating that they were available to observe the balloting. Hence, 13 out of 26 assisted voters at that box went unobserved. (3) At Putnam, Mrs. Robertson, the election manager, publicly called the federal observers "nosey", and made other comments, apparently in jest, about their presence. Yet, federal observers at this box were able to observe all but 2 of the 66 assisted voters.

infected with racial discrimination, federal courts are nonetheless guided by equitable considerations in determining whether to invalidate a completed election. The Fifth Circuit, in a recent en banc decision, Toney v. White, 488 F.2d 310 (1973), reversing in part the panel opinion, 476 F.2d 203, made three pertinent groupings of state election cases attended by demonstrable racial discrimination. The first class of cases relate to instances where pre-election relief against discriminatory practices was sought and improperly denied; [13] the mere passage of time did not preclude post-election relief, and new elections were ordered. The second class of cases concern practices of racial discrimination where pre-election judicial relief, though readily available, was not timely sought,[14] and post-election relief was denied because of lack of diligence of the aggrieved plaintiffs. The third class of cases deal with racially discriminatory practices for which effective pre-election judicial relief was nonexistent, as where the grievous conduct occurred on the very day of election or so close thereto as to make it impossible, or virtually impossible, to seek judicial remedy in advance of the election.[15] As for cases coming within the third category, we understand that the election may be set aside only upon a finding that "the racial discrimination was gross, spectacular and wholly indefensible", (Bell, 376 F.2d at 664), or that the evidence established "racial discrimination which might have affected the election results", (Toney, en banc, 488 F.2d at 314).

█ In the case sub judice, the first described category of election cases may be put aside and not considered since the plaintiffs sought no pre-election relief in the courts. Indeed, more than eight months passed after the election before plaintiffs made any attack on the legality of the election. Therefore, to the extent that irregular election practices, even though infected with racial discrimination, were known to plaintiffs or in the exercise of diligence should have been known well in advance of the election, such known or knowable practices would not be proper grounds for voiding the 1971 elections. It is obvious that prior to the election, plaintiffs could have feasibly invoked judicial relief to avoid or correct at least three practices they now complain of. Plaintiffs were surely aware of, or they could easily have discovered, certain election arrangements claimed to be objectionable or obnoxious to them. These known conditions may be enumerated as follows: (1) The composition, duties and racial makeup of the several election officials at the various precincts, as they were the same persons who had previously served, both in the August primaries and still earlier elections. Despite the fact that the identity of the election officials was well-known to them, the plaintiffs failed to enter pre-election protest to their continuance in office or to obtain relief from the presence of all-white election officials at four precincts. (2) The long-established location of two polling places in buildings disfavored by plaintiffs. (3) The practice of restricting poll watchers in general elections to challengers selected by a political party and not by individual candidates. The failure to challenge these aspects of the election, before November 2, 1971, is attributable to lack of diligence. Because of novel circumstances surrounding poll watchers at this general election, that aspect of the case deserves further discussion.

In our view, the issue of poll watchers being available to act for individual candidates on the ballot was clearly foreseeable at least 40 days prior to the

---

13. Hamer v. Campbell, 358 F.2d 215 (5 Cir. 1966); Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969), reversing Hadnott v. Amos, 295 F.Supp. 1003 (M.D. Ala.1968).

14. McGill v. Ryals, 253 F.Supp. 374 (M.D. Ala.1966), appeal dism'd 385 U.S. 19, 87 S.Ct. 212, 17 L.Ed.2d 17; Smith v. Paris, 257 F.Supp. 901 (M.D.Ala.1966).

15. Bell v. Southwell, supra; Toney v. White, en banc opinion, supra.

general election. That was the deadline for independent candidates to gain ballot position, yet it is apparent that neither plaintiffs nor their agents took any action whatever beyond a casual effort to obtain informal clarification from the State Attorney General's office just one day before the election. Mississippi law clearly provided for only two poll watchers in general elections selected by an organized political party; their function was merely "to detect and challenge illegal voters." (See note 6, supra). This restriction differed markedly from the regulations governing primary elections, which expressly granted all individual candidates the right to be present either in person or by representative "to inspect the manner in which the election is held", and "to challenge the qualifications of any person offering to vote."[16] This conflict between the laws governing general elections and those affecting party primaries posed a serious problem for plaintiffs, which they could ignore only at their peril, in view of the established practice that individual candidates, as distinguished from political parties, had never been allowed challengers at a general election. The eleven blacks on the Humphreys County ballot, indisputably, were not nominated by a political party, nor did they purport to represent a political organization, but were running as independents. In the exercise of reasonable diligence, plaintiffs were fairly chargeable with knowledge that the state's election laws contemplated the presence of challengers to act only for political parties; yet, they failed to seek pre-election injunctive relief on the ground that the state's election machinery, in the unusual circumstances presented, would disadvantage or burden black candidates or voters at the polls. Contrary to plaintiffs' assertions,

the evidence plainly shows that when the independent poll watchers were first excluded from the polls, the exclusion was not motivated by racial discrimination directed at the poll watchers or the black candidates but was the result of the precinct officials acting in accordance with established election procedures. It is important to note that no proof was offered by plaintiffs to show that official conduct had varied from the officials' interpretation, or that individual white candidates were allowed challengers at this or previous general elections.

■ It is not necessary for us now to evaluate, in terms of federal constitutional requirements, the effect of Mississippi's general election statute on poll watchers in a setting of white candidates chosen by a political party opposed by black candidates running as independents. The election officials, when informed of the opinion of the State's Attorney General that they might admit two challengers for independent candidates, allowed the poll watchers to enter the polls without further hindrance. The record discloses that Attorney General Summer, subsequent to the November 1971 general election, issued a formal opinion that independent candidates may be considered as a political party and thus allowed two challengers at each polling place in general elections. Had a formal ruling been timely sought, it is apparent that the confusion in Humphreys County over poll watchers would never have arisen. Even so, for many hours during the progress of the election, poll watchers representing the independent candidates, were on duty at every polling place in the county; yet, neither the poll watchers nor plaintiffs' other witnesses offered any testimony that they detected or challenged illegal

16. Miss.Code 1942, § 3128.5 (now § 23–1–41 Code of 1972):

"Each candidate shall have the right, either in person or by a representative to be named by him, in writing, to be present at the polling place, and the managers shall provide him or his representative with a suitable position from which he or his representative may be able to carefully inspect the manner in which the election is held. He or his representative shall be allowed to challenge the qualifications of any person offering to vote, and his challenge shall be considered and acted upon by the managers."

voters at the polls or that illegal votes were, in fact, cast at any polling place. This constrains us to conclude that, irrespective of whether the problem of challengers was reasonably foreseeable by plaintiffs, the exclusion of poll watchers during morning hours should not justify setting the election aside.

There remain other aspects of the election, however, which do relate to practices which occurred on election day and from which plaintiffs had no ready means for obtaining pre-election relief. Election practices of this nature are to be analyzed by alternative standards to determine whether, as in *Bell,* the election was attended by "gross, spectacular and wholly indefensible" state-imposed racial discrimination, or infected, as in *Toney,* with racial discrimination "of such a substantial nature as possibly to have affected the outcome of the election."

■ We first consider the significant error in counting the ballots which was occasioned by the failure of the election officials to count 714 ballots properly marked for certain offices, yet wholly disregarded because they were unclearly marked for another office. This mistake was an irregularity easily susceptible of correction and was corrected, without difficulty, by the election officials upon recount and final canvass of the returns one month before the plaintiffs filed the present action. The evidence shows that this error occurred only at certain boxes, and was carefully documented in the reports of the federal observers. No ballots were lost, mislaid or destroyed at the original count; on the contrary, all ballots, whether counted or not, were preserved in their original condition and subsequently examined by government attorneys. We are thus able to hold the ballots remained in a state of accurate tabulation at the time of recount, and the original counting error did not result in confusion or prejudice in ascertaining the voters' preferences. Additionally, the evidence showed that ballots improperly disregarded were cast for white as well as black candidates. It cannot be

said that the practice was done with a purpose of racial discrimination, nor did the improper count, in fact, have a racially discriminatory effect. As previously found, the election results for every contested post, when the votes were accurately recounted, remained unchanged. Given these plain facts, we hold that the original error in counting 714 ballots, long since corrected, may not be regarded either as gross or spectacular discrimination or as conduct likely to affect the outcome of the election. In other respects, the tallying of votes by election managers was done publicly, in conformity with state law, and was conducted without racial discrimination of a level to invalidate the count. Despite the deplorable assault upon Robbie Dix at the Putnam box by an intoxicated, unruly spectator, nothing occurred at that box to adversely affect the honest tallying of votes made in the full view of challengers and federal observers alike.

■ Plaintiffs next sharply challenge both the adequacy and impartiality of the assistance given on election day to black illiterate voters. They mount several attacks upon the practices employed in the Humphreys County election. First, they assert that black voters needing assistance are entitled to be assisted by black election officials. This precise point was raised in Hamer v. Ely, 410 F.2d 152 (5 Cir. 1969), in a suit to set aside a municipal election at Sunflower, Mississippi, also conducted with federal observers present at the polls. In an opinion by Circuit Judge Wisdom, the Court rejected the claim that refusal to appoint black officials to render voting aid was a failure to provide the "adequate assistance" mandated by the Voting Rights Act of 1965, specifically 42 U.S.C. 1973*l*(c)(1). Hamer relied upon United States v. Mississippi, 256 F.Supp. 344, 349 (S.D.Miss., 3-judge court 1966), which enunciated the duty of election officials in Mississippi "to provide to each illiterate voter who may request it *such reasonable assistance* as may be necessary to permit such voter to cast his

ballot in accordance with the voter's own decision." (Emphasis added). We read *Hamer* as holding that otherwise proper assistance provided by election officials to illiterate black voters upon their request satisfies the requirement of being both adequate and reasonable, irrespective of the race of the assisting official. Since Humphreys County conducted the 1971 general election in accordance with controlling federal law announced in United States v. Mississippi and in Hamer v. Ely, defendants were under no duty to staff black precinct officials at all polling places merely to render assistance to illiterate voters. No court, to our knowledge, has yet construed the Voting Rights Act of 1965 to require rendering voter-assistance to illiterates along racial lines, and we expressly decline to do so. Again, the federal observers' reports and other credible evidence fully support the factual conclusion that white officials, while rendering assistance at the polls, did not mislead, intimidate or coerce black assisted voters contrary to their wishes.[17]

■ Plaintiffs next urge, as a matter of law, that black illiterates were entitled to have assistance of their own choice, like the blind or disabled voters, and not be limited to assistance provided by election officials. The evidence disclosed that some illiterate black voters were not allowed to bring into the polls persons to assist them in voting. As previously determined, nearly all assisted voters, including the blind, the disabled and the illiterate, were assisted alike by precinct officials. Hence, the claimed disadvantage to illiterate blacks in the 1971 county election is more fancied than real. Certainly the fact that a few blind or physically disabled persons, of both races, had outside assistance did not constitute gross, spectacular or wholly indefensible discrimination to the illiterate voters. Neither should it be considered as racially discriminatory conduct likely to affect the election's outcome.

■ It is true, however, that blind and disabled voters did have the right to obtain assistance, as they might choose, either from an election official or a person of their choice. State law expressly conferred such an option upon that class of voters needing assistance.[18] On the other hand, state law, prior to 1965, expressly restricted the assistance for illiterate voters to that provided by an election manager.[19] Although state law, after 1965, did not expressly provide for rendering assistance to illiterate voters, the three-judge district court in United States v. Mississippi, supra, held

17. Statistical evidence by plaintiffs' expert, John S. de Cani, suggested that at 6 boxes where more than 50% of the voters were black, the percentage of assisted voters casting their ballots for black candidates where black assistance was available was significantly greater than the percentage of assisted voters voting for black candidates where only white assistance was available, a contingency which de Cani stated was likely to occur by chance in less than 1 in a million. Defendants' expert, Howard Dockery, challenged the propriety of the samples used by de Cani as well as his conclusions. We find it unnecessary to probe hypothetical, statistically-based testimony, which is at sharp variance with the federal observers' reports. Absent the detailed, positive findings by the observers as to the fairness of the managers in providing assistance, plaintiffs' statistical data might merit further study.

18. Miss.Code 1942 § 3272 (§ 23-5-157, 1972 Code) provides:

■

"Any voter who declares to the managers of the election that, by reason of blindness or other physical disability, he is unable to mark his ballot, and whose declaration is *not palpably untrue*, shall have the *assistance of one of the managers or other person of his own selection*, in the marking thereof; but such person giving such assistance shall not give information in regard to the same." (Emphasis added).

19. Miss.Code 1942 § 3273 (until repealed June 30, 1965, by Ch. 19, § 1, Miss.Laws 1965 Ex.Sess.) formerly provided:

"A voter who declares to the managers of the election that by reason of inability to read he is unable to mark his ballot, if the same be true, shall, upon request, have the *assistance of a manager* in the marking thereof; and the managers shall designate one of their number for the purpose, who shall note on the back of the ballot that it was marked by his assistance; but he shall not otherwise give information in regard to the same." (Emphasis added).

that "some suitable arrangement must be made to afford this assistance [to illiterate voters]; and there are ample resources under the Act [Voting Rights Act of 1965, § 5; § 12(d)] to effectuate it." 256 F.Supp. at 348. As a consequence of this void in state law, the Court fashioned a declaratory judgment to impose *upon precinct officials at each election* the duty and responsibility of giving "reasonable assistance" to each illiterate voter requesting it. *Hamer* construed "reasonable assistance" as not requiring black assisters for illiterate black voters; and we interpret "reasonable assistance", insofar as the 1971 general election was concerned, as aid which was required to be furnished by election officials. Since the officials in Humphreys County furnished such assistance to all black voters needing and requesting assistance, and furnished it in a manner to permit every assisted voter to cast his ballot in accordance with the voter's own decision, "reasonable assistance" in terms required by federal law was extended to illiterate voters who participated in the election.

Having closely examined plaintiffs' other claims of election-day irregularities, we conclude that the points they raise, singly or in combination, are insufficient to set aside the completed election. Although concerned about the acts of three election managers which precluded federal observers from effectively observing 40 assisted voters, we find that this came about from misunderstanding of instructions as to the correct procedure for federal observers, and not from discriminatory intent of the election officials. The proper procedures were adopted without undue delay, and thereafter followed, so that the outcome of the election could not possibly have been affected by the noted incidents. We hold that no grounds exist for setting aside the general election.

(b) LEGAL PRINCIPLES APPLICABLE TO PROSPECTIVE RELIEF.

Plaintiffs assert that, notwithstanding the principles settled in United States v. Mississippi and Hamer v. Ely, in future Humphreys County elections they are entitled to have a greater measure of assistance extended to illiterate voters, i. e., illiterate voters should receive the same quality and kind of assistance as state law grants to the blind and disabled voters. Plaintiffs urge that this claim is viable because of two constitutional principles mandated by the Fourteenth Amendment: First, that in a state's regulation of the right to vote in state and local elections, distinctions which amount to exclusion from the franchise are impermissible, except where necessary to promote a compelling state interest. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Ferguson v. Williams, 343 F.Supp. 654 (N.D.Miss., 3-judge court, 1972). Second, that in Humphreys County, a suspect racial classification results when illiterate voters, most of whom are black, are denied outside assistance of their choice by election managers while blind and disabled voters, the great majority of whom are white, are statutorily allowed such outside assistance; and that this difference in treatment of assisted voters burdens blacks more than whites, thus constituting an arrangement which cannot stand, absent some compelling state interest to justify the distinction. McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Jackson v. Godwin, 400 F.2d 529 (5 Cir. 1968); Gilmore v. Greene County Democratic Party Executive Committee, 435 F.2d 487 (5 Cir. 1970).

██ Defendants do not question the efficacy of these settled doctrines, but suggest that the issue ought to be referred to the three-judge court constituted in United States v. Mississippi, since it retained continuing jurisdiction at the time of its 1966 declaratory judgment ruling. Defendants maintain that that court, rather than this one, is the proper tribunal in which to seek a definitive ruling regarding assistance to illiterate voters, especially since any judicially-imposed additional requirements are apt to be of state-wide import. This suggestion is hardly a satisfactory solu-

tion either to the plaintiffs or to this court in the discharge of its responsibility in the pending action. Plaintiffs were not parties to the litigation styled United States v. Mississippi, nor do they have assurance of being allowed to intervene therein eight years after judgment. Plaintiffs, here seeking their day in court, should not be lightly turned aside. While this court has found it equitable and just to uphold the 1971 Humphreys County general election, we do believe that we are obliged to address the distinctive issue raised by the plaintiffs. Without doubt, the difference in assistance allowed the several classes of voters needing assistance was a question not before the court in United States v. Mississippi, nor does it appear that plaintiffs' contentions have ever been elsewhere raised or decided in state or federal decisions interpreting the state's election laws. Also, since the 1966 decision in United States v. Mississippi, the Mississippi legislature has continued to provide no statutory regulation for assisting illiterate voters, despite a requirement for such voter assistance in the Voting Rights Act. United States v. Louisiana, 265 F.Supp. 703 (E.D.La. 1966), aff'd 386 U.S. 270, 87 S.Ct. 1023, 18 L.Ed.2d 39. It has remained, until now, an open and unsettled question whether distinctions can be validly practiced by election managers in the type of assistance provided to different classes of voters needing assistance at the polls. We are not persuaded that the Fifth Circuit's rationale in Sands v. Wainwright, 491 F.2d 417 (1973), requires the convening of a three-judge court under 28 U.S. C. § 2281 to resolve this issue. Since the repeal of § 3273, no settled statewide practice or policy in assisting illiterate voters can be said to exist, and defendants do not contend otherwise. Further, if impermissible distinctions among classes of assisted voters should be found to exist on a statewide basis, constitutional defense thereof would be frivolous in the light of Dunn and McLaughlin, supra. Thus, a three-judge court need not be convened. Bailey v. Patterson,

369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Sands, supra, 491 F.2d at 422–423.

In Morris v. Fortson, 261 F.Supp. 538 (N.D.Ga., 3-judge court, 1966), a Georgia statute which allowed a person to assist no more than one illiterate voter at the polls was held invalid under the Fourteenth Amendment as implemented by the Voting Rights Act of 1965, where other provisions of state law allowed a person to assist as many as ten blind and disabled voters. Morris, a case without racial implications, found that the statutory classification was unduly restrictive for illiterates in the exercise of the voting franchise and ruled that all assisted voters—whether illiterate, blind, or disabled—should be treated alike. In Gilmore, supra, the Fifth Circuit held unconstitutional the practice of Alabama election officials who allowed literate voters to bring sample ballots into the polls, but prohibited illiterate voters from doing so. Noting that Alabama had no statute forbidding the use of a sample ballot, the Court found that the practice was not only a denial of equal protection to all illiterates voting in the primary, but also that it " 'inevitably impose[d] a greater burden on Negroes than whites under existing dominant social patterns,' and . . . was 'inherently discriminatory as applied.' " Gilmore, 435 F.2d at 491.

The principles enunciated by the two foregoing cases are applicable here and require us to ban distinctions made between classes of assisted voters in future elections in Humphreys County, unless there is a compelling state interest to justify different treatment. It is not enough that the classification may be viewed as reasonable; defendants are required to show that it is necessary to the State's interest in honest, orderly elections, and that no less objectionable alternative exists. Although they acknowledge that a strict standard of judicial review should here apply, defendants fail to advance any basis to justify a continuance of differential treatment ac-

corded the several classes of assisted voters.

It may be suggested that illiterate voters are inherently more susceptible to partisanship efforts than are blind and disabled voters, so as to justify circumscribing assistance for illiterate voters to a greater degree than for other classes of assisted voters. There is no evidentiary support for this view. Indeed, it would be quite difficult to establish that the blind and physically disabled voters are generally more independent of others, or less helpless, in voting, than the class of illiterate voters. Further, if such a showing were made, the distinctions which obtain could produce untoward results. The blind illiterate may receive outside assistance, but the illiterate with sight may not; and the illiterate voter, also physically disabled and presumably more helpless, can receive the outside assistance denied to the illiterate voter without physical impairment. Thus, any classification between physically disabled voters and illiterate voters, in terms of who may render assistance at the polls, rests upon unclear, if not dubious, reasoning. Of course, in Humphreys County, allowing outside assistance for illiterate voters, far more numerous than blind and disabled voters, could result in overcrowding at some polling places, and thus become an administrative problem for precinct officials. No doubt, limiting the number of assistants at any given time would serve the convenience of officials. But precinct officials have at their disposal the lawful means to limit or restrict the number of voters appearing at the polls at any one time and are authorized to take reasonable action to eliminate conditions which interfere with orderly elections. Considerations of administrative convenience alone, however, reasonable they might be, are insufficient to "impinge upon the exercise of important constitutional rights" (as the voting franchise). *Ferguson,* supra, 343 F.Supp. at 656.

■ ■ We hold that no compelling reason exists for the election officials in Humphreys County to adhere to practices which distinguish between voter assistance offered to illiterates and that allowed to the blind and disabled. Since Mississippi's election laws expressly permit optional assistance for the blind and disabled voters, the Fourteenth Amendment mandates that like optional assistance be extended to *illiterate* voters. We accordingly declare that in all future Humphreys County elections, precinct officials shall allow to all voters needing assistance at the polls the voter assistance currently sanctioned by state law for blind and disabled voters, specifically § 23–5–157, Code of 1972. See note 18, supra. Furthermore, the election officials shall make no distinction between literate and illiterate voters in the use of sample ballots, if such aids are permitted to be used at the polls, nor shall they otherwise engage in racially discriminatory conduct in the performance of their official duties.

■ We also conclude that in view of incidents occurring at the last election, pertinent observations of federal observers, and considerations of fairness, we are warranted in granting injunctive relief in two respects. First, the polling places in Beat 5, at Midnight and Louise, which are presently located on privately-owned property should be relocated, unless physically impossible, in publicly-owned buildings. The county board of supervisors, under § 23–5–11, has full authority to make these changes in advancè of the next election. Therefore, the supervisors will be ordered to locate and designate other sites more suitable for polling places in Beat 5, and give public notice thereof. Second, the continued absence of black officials at certain precincts should be eliminated. Hence, the county board of election commissioners shall be enjoined against practicing racial discrimination in selecting and assigning duties to persons appointed as managers, clerks, bailiffs and other officials at the Four-Mile, Gooden Lake, Isola and Putnam polling places.

Let an order be entered accordingly.