UNITED STATES of America, Plaintiff-Appellant,

v.

SAINT LANDRY PARISH SCHOOL BOARD et al., Defendants-Appellees.

No. 77–2237.

United States Court of Appeals, Fifth Circuit.

Aug. 30, 1979.

Edward L. Shaheen, U. S. Atty., J. Ransdell Keene, Asst. U. S. Atty., Shreveport, La., Walter W. Barnett, Joel L. Selig, Attys., Civ. Rights Div., Drew S. Days, III, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

I. Jackson Burson, Jr., Asst. Dist. Atty., Eunice, La., for School Bd. and individual members.

Before THORNBERRY, GOLDBERG and GEE, Circuit Judges.

GOLDBERG, Circuit Judge:

The government brought this action claiming that a vote-buying scheme, allegedly carried out at a school board election in district ten of St. Landry Parish, Louisiana, violated various provisions of the Voting Rights Act. The district court dismissed the government's two count complaint for failure to state a claim upon

which relief could be granted.[1] The government now appeals that dismissal. We affirm as to count I and reverse as to count II.

Because the issue before us is the sufficiency of the government's complaint, we will outline its allegations in detail. The complaint names as defendants various members of the Saint Landry Parish School Board, including Bobby Dupre, the successful candidate in the February 21, 1976 election in district ten. The complaint also names as defendants three poll commissioners who served in that election. The complaint alleges that district ten contained 1280 registered white voters and 1883 registered black voters and that the white candidate Dupre received 1148 votes, while the two black candidates combined received only 737 votes. The complaint alleges that as a result of the election, Dupre was seated as the representative to the school board for district ten. We will quote the remaining, crucial allegations of the complaint in full. The complaint alleges that:

¶ 9. Defendants participated during the election of February 21, 1976, in a scheme whereby a substantial number of black voters were offered and paid money for their vote for a candidate who was not of their choice.

¶ 10. The black voters mentioned in paragraph 9 were driven to the polls by drivers transporting said voters at the instruction of defendant Mr. Bobby Dupre, were accompanied into the voting booth by defendant poll officials and the votes of said black voters were cast by defendant poll commissioners for the can-

didate that the poll commissioners desired regardless of the voters' choice and in spite of the voters' ability to vote without assistance.

¶ 11. The black voters mentioned above were given tokens for their votes by the defendant poll officials and those tokens were redeemed for money by persons employed by Mr. Bobby Dupre.

¶ 12. The votes cast in the above-described manner were accepted as valid votes by defendants and the acceptance of those votes could have affected the outcome of the election in District 10.

The complaint then sets out the two counts. Count I claims that the above-described conduct of the three defendant poll commissioners constitutes an unapproved change in the state's procedure for assisting voters which is subject to the approval requirements of § 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Count II claims that above-described practices of the defendants "had the purpose and effect of denying or abridging the right to vote on account of race or color in violation of 42 U.S.C. §§ 1971(a) and 1973." The complaint evidently seeks the same relief under each count. Specifically, it asks the court to order a new election and to enjoin the defendant poll commissioners from participating in such practices in future elections. We will examine each of the two counts separately.

I.

Count I attempts to state a claim under § 5 of the Voting Rights Act. That section requires certain covered states [2] to obtain

---

1. The defendants moved to dismiss the complaint on various grounds, including lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. The district court said that it was dismissing the complaint for want of jurisdiction. But there was clearly jurisdiction. The complaint purports to state claims under several sections of the Voting Rights Act, and each of these sections has a special jurisdictional statute. *See* 42 U.S.C. § 1971(d); 1973j(f). *See also* 28 U.S.C. §§ 1345 & 2201 (alternate bases of jurisdiction). From our reading of the district court opinion, we conclude the district court actually dismissed the complaint for failure to state a

claim upon which relief can be granted, and we will treat the dismissal as such.

2. Section 5 also applies to covered "political subdivisions." But, for convenience, we will throughout the opinion simply refer to covered states. What we say, of course, applies equally to covered political subdivisions.

Count I alleges that the § 5 approval requirements are applicable in this case, but the complaint does not specify whether it was the state or the political subdivision which allegedly enacted or administered the change in voting procedure. Because the defendant poll commis-

approval of certain changes in their standards, practices, or procedures with respect to voting.[3] A covered state making a change in its voting procedures subject to the § 5 approval requirements must either submit the new procedure to the Attorney General for approval or bring a declaratory judgment action in the United States District Court for the District of Columbia. 42 U.S.C. § 1973c. The change will be approved if the Attorney General poses no objection to it within 60 days after its submission or if the district court for the District of Columbia finds that the new proce-

dure has neither the purpose nor the effect of denying or abridging the right to vote on account of race. *Id.*

The enforcement provisions of the Act allow the United States to bring action under § 5 seeking a declaratory judgment that a state has made an unapproved change in its voting procedure which is subject to the § 5 approval requirements. *See* 42 U.S.C. § 1973j; *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 826 & n. 21, 22 L.Ed.2d 1 (1969).[4] The Supreme Court has held that this issue must be de-

---

sioners were required to follow the state's procedures for assisting voters, we will treat the complaint as though it alleges that the state has made the change. However, our analysis and conclusion would be the same were we to treat the complaint as alleging that the change was made by the political subdivision.

**3.** Section 5 provides:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until

the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event, the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 23 and any appeal shall lie to the Supreme Court.
42 U.S.C. § 1973c.

**4.** A change will be subject to the § 5 approval requirements if it falls "within the definitional terms of § 5" and if it has any "potential" for denying or abridging the right to vote on account of race. *Georgia v. United States*, 411 U.S. 526, 93 S.Ct. 1702, 1707, 36 L.Ed.2d 472 (1973).

cided by a three-judge district court. *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 830, 22 L.Ed.2d 1 (1969). That court does not have the authority to approve or disapprove a covered change. The approval decision remains with the Attorney General or the United States District Court for the District of Columbia. *Perkins v. Matthews*, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). If it is shown that a state has made an unapproved change in its voting procedures, which is subject to the § 5 approval requirements, the court may enjoin the state from enforcing the new procedure until the state has received the required approval. *Id.* 89 S.Ct. at 826.

In this case the district court concluded that the actions of the three poll commissioners were simply "isolated instances of election fraud" which did not constitute a "procedure susceptible of approval" under § 5. For this reason, the district court dismissed count I. The government claims that the district court erred in dismissing count I. It claims that the actions of the poll commissioners constitute a voting procedure covered by § 5. The government further argues, however, that whether or not the alleged voting procedure is covered by § 5, the district court had no authority to dismiss count I. The argument goes like this. Since count I is a coverage claim under § 5, it must be heard by a three-judge court. Accordingly, the district court, since it was a single-judge court, could not properly dismiss the claim.[5]

■ This argument, however, does not take account of the fact that the single-judge district court to whom the request for a three-judge court is made has the authority to determine if a three-judge court is

required. 28 U.S.C. § 2284(b)(3). While it is true that coverage questions must be determined by a three-judge court, *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 830, 22 L.Ed.2d 1 (1969), a three-judge court is not required if the claim is wholly insubstantial or completely without merit.[6] In such a case the single-judge court may properly dismiss the claim. As we read the district court opinion, the judge found that the coverage claim was wholly insubstantial and completely without merit. If this finding is correct, the district court properly dismissed count I.

The participation of the three defendant poll commissioners in the vote-buying scheme allegedly consisted of the following actions: The poll commissioners accompanied certain black voters into the voting booths and cast their votes "for the candidate that the poll commissioners desired regardless of the voters' choice and despite the voters' ability to vote without assistance." The three commissioners then gave these black voters tokens which could be redeemed for cash from employees of candidate Dupre. The poll commissioners counted these votes as valid. According to count I, the poll commissioners' actions constitute a change in the state's procedure for assisting voters which is subject to the approval requirements of § 5. Louisiana has enacted procedures for assisting voters, and these procedures have received § 5 approval. *See* La.Rev.Stat.Ann. § 18:564 (West.1979) (Formerly § 18:857). Although the poll commissioners were required to follow these procedures, they allegedly did not act in accordance with them.

■ The approval requirements of § 5 apply only when "a state or political subdi-

---

5. The government did move to convene a three-judge court to hear count I.

6. The Supreme Court has held, with respect to actions which formerly required a three-judge court, that a three-judge court need not be convened if the claim is wholly insubstantial or completely without merit. *Goosby v. Osser*, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973); *Bailey v. Patterson*, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962). In *Broussard v. Perez*, 572 F.2d 1113, 1118 (5th Cir. 1978), we held that this "precedent can be applied to

actions brought under § 5 of the Voting Rights Act which are insubstantial or frivolous." *Accord, James v. Humphreys County Board of Election Commissioners*, 384 F.Supp. 114 (N.D. Miss.1974). As we explained in *Sands v. Wainwright*, 491 F.2d 417, (5th Cir. 1973), " 'Congress could not have intended to require three judges to be assembled when the decision could not possibly go in any manner save one.' " (quoting *Utica Mutual Ins. Co. v. Vincent*, 375 F.2d 129, 131 (2d Cir. 1967)).

vision shall enact or seek to administer" a change in its voting procedures. 42 U.S.C. § 1973c. Although the actions of these poll commissioners could possibly be viewed as a change in voting procedures within the meaning of § 5,[7] we conclude that these actions do not constitute a change that the state *has enacted or sought to administer* within the meaning of that section. This conclusion is compelled by the language of § 5, the nature of the approval procedure envisioned by § 5, and the cases interpreting that section.

We do not dispute that the actions of the three poll commissioners constitute actions of the state for certain purposes. *See* part II *infra*. But one would not normally conclude that a state "enacts or administers" a new voting procedure every time a state official deviates from the state's required procedures. The commonsense meaning of "shall enact" indicates that action of a state, *as a body*, is envisioned, and we think "shall seek to . . . administer" was added to cover situations when an enactment was not actually passed, but when a procedure was nonetheless widely administered with at least the implicit approval of the state governing authority.

We realize, of course, that statutory language is not always interpreted in a common-sense manner. But we can find no case which even hints that actions of a state official which are in conflict with the state's

required procedures should be considered a change in voting procedures enacted or administered by the state within the meaning of § 5. On the contrary, the cases speak only of actions taken by the governmental authority of a state as being subject to the approval requirements of § 5.[8] Although we can find no case which has interpreted the "shall seek to . . . administer" language, we are certain that whatever that language may cover, it does not cover the isolated actions of the three poll commissioners in this case.

The approval requirements of § 5 compel this conclusion. Surely Congress did not intend the Attorney General and the district court for the District of Columbia to waste their time considering voting procedures that a state does not wish to enact or administer. But this would be the result if we required the state to submit for approval, as a new voting procedure, those actions of state officials which conflict with the state's required procedures.

We do not mean to intimate that state officials are free to violate approved state procedures and conduct an election in a discriminatory manner. Congress was well aware that such an abuse might occur, and it prohibited such action under other sections of the Voting Rights Act. *See* 42 U.S.C. §§ 1971(a) & 1973; part II *infra*. All we are saying is that this abuse is not one that § 5 was designed to alleviate.

---

**7.** Section 5 applies to a change in a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c. We do not deny that poll commissioner's procedures for assisting voters, when enacted or administered by the state, are standards, practices or procedures with respect to voting within the meaning of § 5. *See Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969). In fact, as we stated, Louisiana has enacted procedures for assisting voters, and these procedures have received § 5 approval. *See* La.Rev.Stat.Ann. § 18:564 (West 1979).

**8.** The cases uniformly speak of § 5 as applying to "enactments," "legislation," "regulations," and "laws"—all actions taken by the governmental authority of state. *See, e.g., Perkins v. Matthews*, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971); *Allen v. State Board of*

*Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). Moreover, in *Allen v. State Board of Elections*, the Supreme Court partially based its holding, that coverage questions must be decided by a three-judge court, on the clash that coverage questions would cause between the federal government and the "governing authority of the state." 89 S.Ct. at 830. The Court recognized that there would be a clash between "federal and state power" and a "potential [for] disruption of state [government]" whenever there was a disagreement about whether a change in voting procedures was subject to § 5. *Id.* The Supreme Court's language in *Allen* and its concern over a federal-state clash indicates that § 5 applies only to changes in voting procedures either actually enacted by the state or, if not enacted, widely administered with at least the implicit approval of the state governing authority.

Section 5 is a conceptual policing statute. It provides for analysis of a state's voting procedures to ensure that democracy in voting ensues. It was not designed nor intended to provide sanction for every fraudulent election. It does not operate to discover or uncover every artifact of political manipulation. Section 5 has its own political cosmos, but it does not possess a universality with respect to every electoral aberration. A voting procedure need not have the seal of the state to come within § 5, but it must be more than these isolated instances of bargaining for votes.

■■■ For these reasons, we think it clear that the government's § 5 claim was "wholly insubstantial" and "completely without merit."[9] Therefore, the single-judge district court properly dismissed that claim.

## II.

■■■ Count II claims that the defendants' participation with candidate Dupre in the vote-buying scheme "had the purpose and effect of denying and abridging the right to vote on account of race in violation of 42 U.S.C. § 1971(a) and § 1973." Of course, to be sufficient, the complaint must do more than state such conclusions. *Webber v. White*, 422 F.Supp. 416 (N.D.Tex.1976). It must contain allegations which, if proved, would constitute violations of these sections of the Voting Rights Act. The district court dismissed count II because it found no such allegations.

We disagree with that conclusion. In this connection we look to paragraph ten of the complaint which alleges:

The black voters mentioned in paragraph 9 were driven to the polls by drivers transporting said voters at the instruction of defendant Mr. Bobby Dupre, were accompanied into the voting booth by defendant poll officials and the votes of said black voters were cast by defendant poll commissioners for the candidate that the poll commissioners desired regardless of the voters' choice and in spite of the voters' ability to vote without assistance.

The phrase "regardless of the voters' choice" is ambiguous, but it could mean regardless of the choice the voters made *while in the voting booth*. So interpreted, the complaint alleges that when black voters sought assistance and asked the defendant poll commissioners to cast their votes for one of the black candidates, the poll commissioners nonetheless cast their votes for candidate Dupre.[10] This interpretation of paragraph ten is not implausible. It could be that some black voters did not understand that accepting transportation to the polls meant that they had agreed to sell their votes. Or perhaps, some black voters understood this, but changed their minds after they arrived at the polls. It is also possible that some black voters, who were completely unaware of the vote-buying scheme, actually needed assistance in voting and happened to choose one of the three defendant poll commissioners. In fact, the

9. As noted above in the text, it is clear that coverage questions, once properly posed, must be decided by a three-judge court. While we do not attempt to enumerate other situations in which a single judge might dismiss a claim as frivolous, we believe that in this case, where it is clear from the face of the complaint that the alleged change does not have the requisite state involvement, the single-judge court could properly dismiss the complaint. We note, however, that if a complaint alleges that a change in voting procedures has been made with at least the implicit approval of the state, a single-judge court cannot dismiss the complaint. No matter how small the change in voting procedures, a three-judge court must decide whether the change is covered by § 5. *See, e.g., Sumter*

*County Democratic Executive Comm. v. Dearman*, 514 F.2d 1168 (5th Cir. 1975).

10. The defendants make much of the fact that the complaint does not specifically state that the defendant poll commissioners cast these votes for candidate Dupre. We must, however, interpret the complaint favorably to the pleader, *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), and so interpreted, we think the complaint alleges this. After all, the complaint alleges that these poll commissioners cast the votes for the candidate of their choice, and they were in league in this scheme with candidate Dupre.

government's brief claims that the scenarios we describe actually did occur.[11]

The district court did not interpret paragraph ten the way we do. It interpreted "regardless of the voters' choice" to mean regardless of the choice the voters would have made had they not decided to sell their votes. While this interpretation is certainly possible, our interpretation is also possible, and when considering the sufficiency of a complaint, a court must construe the complaint favorably to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). We must, therefore, interpret the complaint, if possible, to state a claim upon which relief can be grated. Count II, read with our interpretation of paragraph ten, does state such a claim under §§ 1971(a) and 1973.

Section 1971(a) provides in pertinent part that "[a]ll citizens . . . shall be entitled or allowed to vote . . . without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding." 42 U.S.C. § 1971(a)(1). Actions of state officials in conducting an election constitute actions of the state within the meaning of this section. 42 U.S.C. § 1971(c); *see Toney v. White*, 476 F.2d 203 (5th Cir. 1973); *United States v. Dogan*, 314 F.2d 767 (5th Cir. 1963); *James v. Humphreys Board of Election Commissioners*, 384 F.Supp. 114 (N.D.Miss.1974). Certainly the right to vote includes the right to vote for the candidate one selects. Thus, the actions of the poll commissioners deprived those black voters whose directions were not followed of their right to vote. Since the poll commissioners' actions were only directed at black voters, this was a deprivation of the right to vote "without distinction of race." Accordingly count II states a claim under § 1971(a).

Section 1973 provides that "[n]o voting qualification or prerequisite to voting, or standard practice or procedure shall be imposed or applied by any state or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973. The poll commissioners' actions in assisting voters are voting practices or procedures within the meaning of § 1973. *See Toney v. White*, 476 F.2d 203 (5th Cir. 1973); *James v. Humphreys Board of Election Commissioners*, 384 F.Supp. 114 (N.D.Miss. 1974); *Coalition for Education v. Board of Elections*, 370 F.Supp. 42 (S.D.N.Y.1974). Cases show that when voting procedures are applied by state election officials, they are "imposed or applied" by the state within the meaning of this section. *Id.* Since the poll commissioners only applied this practice to black voters, and since it deprived some of these blacks of their right to vote, a claim is stated under § 1973.

The Supreme Court stated in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), that a court must not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the . . . [pleader] can prove no set of facts in support of . . . [its] claim that would entitle . . . [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). As we have shown, the government could prove a set of facts which would entitle it to relief under §§ 1971(a) and 1973. Accordingly, we hold that the district court erred in dismissing count II.

### III.

The government's brief explains that in count II it attempted to allege more than just the claims we described above. The thrust of count II was supposed to be that the defendants' vote-buying scheme, aimed at black voters in this predominantly black, single-member district where racial-bloc voting has traditionally prevailed, violated §§ 1971(a) and 1973 because it diluted the weight of the legitimately cast votes of those black voters who did not participate in the scheme and presumably followed the tradition of bloc-voting. The complaint fails to adequately express this theory. Al-

11. See government's brief pp. 10 & 13 nn. 7 & 8.

though the complaint does allege that the vote-buying scheme might have caused the election of the white candidate in the predominantly black district, the complaint does not allege that the black voters who voted for the black candidate were deprived of their right to vote, nor does it explain that the alleged denial was actually a dilution. Furthermore, the complaint does not allege that the district was in a traditionally racial-bloc voting area.

When the district court dismissed count II, it did so without prejudice. Thus, the government was free to amend the complaint to more clearly express its theory. According to the government, it failed to do so because it concluded that the district court would have dismissed even the amended complaint. The government bases this conclusion on language in the district court opinion which indicates that the district court dismissed the complaint because no one was actually prevented from voting or registering to vote. From this, the government concludes that the district court would not have considered a dilution in the weight of votes cast to constitute a denial of the right to vote within the meaning of §§ 1971(a) and 1973. We are not sure that the government's conclusion is correct, and in any event, we feel that the government should have given the district court an opportunity to pass on its dilution theory.

### IV.

For the reasons expressed in part I of this opinion, we affirm the district court's dismissal of count I of the complaint. For the reasons expressed in part II of this opinion, we reverse the district court's dismissal of count II of the complaint.

AFFIRMED in PART, REVERSED and REMANDED in PART.