George W. MILLER, in his own behalf and in the behalf of others similarly situated, Plaintiff,

v.

Geraldine DANIELS, John Davis, Charles Gadsden and Frank X. Gargiulo, James F. Bass, Robert S. Black, Hector Diaz, Matteo Lumetta, Joseph J. Previte, Martin Richards, Alice Sachs, Anthony Sadowski, and Salvatore Sclafani, Commissioner of Elections of the City of New York in their capacity as the Board of Elections in the City of New York, Defendants.

No. 80 Civ. 7082.

United States District Court,
S. D. New York.

March 2, 1981.

Jeff L. Greenup, Fred L. Wallace, Percy L. Lambert, Hudson H. Reid, New York City, for plaintiff.

Allen G. Schwartz, Corp. Counsel, City of New York, Patrick F. X. Mulhearn, Asst. Corp. Counsel, New York City, for defendant Board of Elections.

Saul Rudes, New York City, for defendant Daniels.

John S. Martin, Jr., U. S. Atty., Richard N. Papper, Asst. U. S. Atty., Southern Dis-

trict of New York, New York City, Gerald W. Jones, John MacCoon, Sheila K. Delaney, Samuel D. Reyes, U. S. Dept. of Justice, Civil Rights Division Voting Section, Washington, D. C., for United States as amicus curiae.

SOFAER, District Judge:

Plaintiff George W. Miller was an unsuccessful candidate for the assembly seat in New York's 71st Assembly District ("the district"). Dissatisfied with the manner in which the Board of Elections conducted the primary and general elections, and denied relief by the courts of New York, plaintiff alleges various violations of the Voting Rights Act of 1965, 42 U.S.C. §§ 1971 to 1973bb–4 ("the Act"), and of other federal statutory and constitutional provisions. His claims purport to rest in part upon section 5 of the Act, 42 U.S.C. § 1973c, and he requests that a three-judge court be convened to adjudicate those claims. Because the section 5 claims are insubstantial and meritless, the request is denied, and those portions of the complaint are dismissed.

## I. Background and Allegations

Plaintiff was the incumbent Assemblyman in the 71st Assembly District, located in Harlem. In the Democratic Party primary for that seat held on September 9, 1980, plaintiff ran against defendants Daniels, Davis, and Gadsden. All four of the candidates were black. Defendant Daniels won the Democratic nomination; plaintiff later won the Republican nomination. The general election was held on November 4, 1980, and Daniels was elected, by a margin of four to one.

■ After the primary, but before the general election, plaintiff petitioned the New York Supreme Court (New York County) to overturn the Democratic primary result because of voting irregularities. The Court assigned the case to a referee.

The referee held hearings on plaintiff's allegations and ruled that plaintiff had failed to establish even half of the number of irregularities necessary to impugn the integrity of the election under New York law. The Supreme Court confirmed the referee's recommendation and dismissed the petition. The Appellate Division (First Department) and the Court of Appeals each unanimously affirmed that dismissal. Associate Justice Thurgood M. Marshall denied interim relief.[1]

Over one month after the general elections, plaintiff filed the complaint in this action. He sues in his own behalf and as the representative of various putative classes. Named as defendants are the successful candidate (Daniels), the two other candidates in the Democratic primary, and the Members of the New York City Board of Elections ("the Board").

On December 30, 1980, plaintiff moved for a temporary restraining order to prevent defendant Daniels from assuming her seat on January 1. In a memorandum and order issued on December 31, this Court denied that motion because plaintiff had failed to establish a likelihood of success on the merits, irreparable injury, or a balance of hardships tilting in his favor. Defendants thereafter moved to dismiss the complaint for lack of subject-matter jurisdiction, Fed.R.Civ.P. 12(b)(1), but that motion is not yet ripe for decision.

The issue presently before the Court—whether a three-judge court should be convened to hear plaintiff's section 5 claims—requires a rather detailed recitation of his allegations. The complaint consists of four counts. Count one involves three aspects of defendants' voter-registration practices. First, New York Election Law § 5–406 requires the Board to strike the registration of persons who did not register, have their registration reinstated, or vote in at least

---

1. Defendants contend that plaintiff presented the state courts with the exact allegations of violation of state law that he presses here. Though the complaint supports this assertion, see Complaint ¶ 50 ("Plaintiff has brought the matters complained of here to the attention of the Courts of the State of New York...."), some of plaintiff's papers dispute that contention. The record is incomplete as to the precise issues adjudicated in the state courts. In any event, collateral estoppel is not relevant to the section 5 claim addressed here.

one election during the preceding two years. Complaint ¶ 9. Plaintiff alleges that 2,000 persons in the 71st Assembly District who met that requirement were improperly stricken from the rolls, *id.* ¶ 11, and that 1,000 persons who failed to meet that requirement were not stricken, *id.* ¶ 12. Second, Election Law §§ 5–102, 5–712 require the Board to strike the registration of voters who are not resident at their recorded addresses thirty days prior to the election. *Id.* ¶¶ 13–15. Defendants purportedly allowed 2,500 persons in the district to remain on the list even though cards mailed to their recorded addresses were returned as undeliverable. *Id.* ¶ 16. Third, Election Law §§ 5–200, 5–202 set deadlines after which new voters may not be registered. Defendants allegedly registered 10,000 persons in the district after those deadlines and prior to the general election. *Id.* ¶ 17. Plaintiff alleges that these various actions violated the Equal Protection Clause, 42 U.S.C. § 1983 ("section 1983") and 42 U.S.C. § 1971(a)(2)(A) ("section 1971(a)(2)(A)"). *Id.* ¶ 18.

Count two involves two aspects of the Democratic primary election. First, plaintiff alleges that the Board violated Election Law §§ 8–302, 8–304 by allowing persons in the district who were not members of the Democratic Party to vote in its primary. *Id.* ¶ 23. In the September 9 election in which plaintiff lost to defendant Daniels, 500 non-party members allegedly voted in the Democratic primary, *id.* ¶ 25; fifteen percent of the voters in the March 25, 1980 Democratic presidential primary allegedly were not enrolled in the party, *id.* ¶ 24. Second, in violation of the two-year rule discussed above (Election Law § 5–406), defendants allegedly permitted 6,000 persons who should have been stricken from the list to vote in the presidential primary, and 2500 to vote in the September 9 primary; these persons were removed from the rolls prior to the general election. *Id.* ¶ 26. These actions are said to violate the Equal Protection Clause, section 1983, and section 1971(a)(2)(A). *Id.* ¶ 27.

Count three involves four aspects of the Board of Elections' tabulation of votes.

First, plaintiff alleges that voting machines in the district regularly record vote totals in excess of the number of voters that sign in. *Id.* ¶ 32. Second, election inspectors in the district certify returns that are left blank and later completed by other persons; in the September 9 primary, one-fourth of the returns in the district were certified even though blank, and they were never completed. *Id.* ¶ 33. Third, although Election Law § 9–124 requires the Board to declare the election results within 120 hours after the polls close, defendants do not declare the outcome in elections in the district for eleven to fourteen days. *Id.* ¶ 34. Fourth, although candidates must challenge voting irregularities within fourteen days after the polls close, defendants delay publication of the results and access to voting records, thereby vitiating candidates' right to protest irregularities. *Id.* ¶ 36. These actions purportedly violate the Due Process Clause, the Equal Protection Clause, section 1983, section 1971(a)(2)(A), and section 5 of the Act. *Id.* ¶ 42.

The fourth count appears to allege a conspiracy to evade the Act. Plaintiff states that, despite a decrease in the district's population, the number of registered voters has increased. *Id.* ¶¶ 43, 46. He alleges that defendants have falsified voting records to escape the section 5 trigger and to facilitate voter manipulation. *Id.* ¶ 47. Plaintiff claims that the will of the majority no longer controls elections in the district, *id.* ¶ 48, and he attributes the situation to racial discrimination against a black and Hispanic district, *id.* ¶ 49.

Plaintiff prays for various types of declaratory and injunctive relief, including nullification of the elections that he lost and an order requiring new elections to be held. *Id.* ¶ 53.

■ The only allegations in the complaint relevant to the convening of a three-judge court are those that implicate section 5. Plaintiff appears to allege that the violations recited in the complaint involve changes covered by section 5, and that those changes have not been precleared pursuant

to the statutory procedures.[2] Assuming for present purposes that the acts complained of were not in effect on November 1, 1968,[3] the issue is whether those acts are changes within the meaning of section 5.

## II. The Three-Judge Court and Section 5

■ Section 5 of the Voting Rights Act provides in pertinent part as follows:

> ... [W]henever a State or political subdivision ... [covered by section 4] *shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting different from that in force or effect on November 1, 1968,* ... such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, ... and unless and until the court enters such judgment *no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided,* That such qualification, prerequisite, standard, practice or procedure may be enforced without such proceeding if ... [it] has been submitted ... to the Attorney General and the Attorneys General has not interposed an objection with sixty days....

42 U.S.C. § 1973c (emphasis added). The purpose and operation of section 5 have been adequately explained elsewhere. *See, e. g., United States v. Board of Commissioners of Sheffield, Alabama,* 435 U.S. 110, 118–22, 98 S.Ct. 965, 972–74, 55 L.Ed.2d 148 (1978); *Allen v. State Board of Elections,* 393 U.S. 544, 548–50, 89 S.Ct. 817, 822–23, 22 L.Ed.2d 1 (1969). Reduced to its barest essentials, section 5 forbids covered jurisdictions from changing their voting qualifications or procedures without the prior approval of the Attorney General or the District Court for the District of Columbia; such approval is known as "preclearance."

■ Private individuals may seek declaratory and injunctive relief against violations of section 5. *Allen v. State Board of Elections, supra,* 393 U.S. at 554–57, 89 S.Ct. at .825–27. The statute provides that "[a]ny action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28...." 42 U.S.C. § 1973c. The three-judge court may adjudicate only what has become known as the "coverage" issue—that is, whether the political subdivision has adopted a change covered by section 5 without obtaining preclearance of that change. If no such change occurred, or if the change was precleared, then the suit is dismissed; if a change occurred and was not precleared, then it is unlawful and may not be enforced. The Court does not in any event consider whether the change had a discriminatory purpose or effect; that inquiry is for the Attorney General or the District Court for the District of Columbia.[4] *See, e. g.,*

---

**2.** The complaint is confusing. With respect to counts one and two, plaintiff alleges violations of *various constitutional and statutory provisions,* but no violation of section 5. *See* Complaint ¶¶ 18, 27. By contrast, plaintiff does claim a violation of section 5 with respect to count three. *See id.* ¶¶ 39, 42. Count four recites no governing provisions. *See id.* ¶¶ 43–49. Nevertheless, the concluding paragraphs allege that the practices complained of in all the counts constitute *violations of section 5, id.* ¶¶ 51, 52, so that allegation will be read into all of the counts.

**3.** Were this case now before the three-judge court, the allegations of change, *see* Complaint ¶¶ 39, 51, would prove fatally conclusory.

Plaintiff does not indicate the manner in which the complained-of practices differ from those in effect on November 1, 1968. Mere recitation of the language of section 5 is insufficient to warrant commencing the stringent enforcement measures provided by the Act.

**4.** In its amicus brief, the United States interprets this Court's December 31 memorandum denying temporary relief as "requiring 'plausible allegations of racial discrimination' as a basis for" a section 5 claim. Memorandum on Behalf of the United States at [7]. That statement in the order was addressed to plaintiff's other statutory claims, not to his section 5 claims. Although courts have disagreed as to whether a section 5 coverage claim must allege

*United States v. Board of Supervisors of Warren County, Mississippi*, 429 U.S. 642, 645–47, 97 S.Ct. 833, 834–35, 51 L.Ed.2d 106 (1977) (per curiam); *Perkins v. Matthews*, 400 U.S. 379, 383–87, 91 S.Ct. 431, 434–36, 27 L.Ed.2d 476 (1971); *Allen v. State Board of Elections, supra*, 393 U.S. at 555 n. 19, 558–59, 89 S.Ct. at 826 n. 19, 827–28.

Although section 5 provides that claims arising under it are to be heard by a three judge court, it also incorporates the provisions of 28 U.S.C. § 2284. That statute, as amended in 1976, states in relevant part:

> A single judge may conduct all proceedings except the trial, and enter all orders permitted by the rules of civil procedure except as provided in this subsection. . . .
> A single judge shall not appoint a master, or order a reference, or hear and determine any application for a preliminary or permanent injunction or motion to vacate such an injunction, or enter judgment on the merits.

*Id.* § 2284(b)(3).

█ Courts confronted with section 5 claims have consistently held that a single judge may dismiss section 5 claims that are wholly insubstantial and completely without merit. *See, e. g., United States v. Saint Landry Parish School Board*, 601 F.2d 859, 863, 865 n.9 (5th Cir. 1979); *Broussard v. Perez*, 572 F.2d 1113, 1118 (5th Cir.), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 610, 58 L.Ed.2d 677 (1978); *Eccles v. Gargiulo*, 497 F.Supp. 419, 423 n.1 (E.D.N.Y.1980); *Beatty v. Dinkins*, 478 F.Supp. 749, 751 (S.D.N.Y. 1979); *Beatty v. Esposito*, 439 F.Supp. 830, 832 (E.D.N.Y.1977); *Webber v. White*, 422 F.Supp. 416, 423–25 (N.D.Tex.1976); *cf. Gangemi v. Sclafani*, 506 F.2d 570 (2d Cir. 1974) (affirming single judge's dismissal of section 5 claim) *Green v. Board of Elections of the City of New York*, 380 F.2d 445, 448–49 (2d Cir.), *cert. denied*, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968) (in suit to declare state law unconstitutional, single judge must determine whether claim is sub-

stantial; if not, must dismiss without convening three-judge court).

In the very case in which it authorized three-judge courts in section 5 suits, the Supreme Court explained why such panels should be sparingly invoked:

> We have long held that congressional enactments providing for the convening of three-judge courts must be strictly construed. . . . Convening a three-judge court places a burden on our federal court system, and may often result in a delay in a matter needing swift initial adjudication. . . . Also, a direct appeal may be taken from a three-judge court to this court, thus depriving us of the wise and often crucial adjudications of the courts of appeal. Thus we have been reluctant to extend the range of cases necessitating the convening of three-judge courts.

*Allen v. State Board of Elections, supra*, 393 U.S. at 561–62, 89 S.Ct. at 829–30 (citations omitted).

Individuals must not be allowed to obtain a three-judge court, with its concomitant burdens, simply by intoning the catchwords of section 5. This Court has an obligation to examine the complaint to determine whether it states a substantial claim.

## III. Substantiality of the Section 5 Claims

█ In keeping with the intent of the framers of the Voting Rights Act, the courts have interpreted section 5 quite broadly. The Supreme Court has declared:

> The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race. Moreover, . . . the Act gives a broad interpretation to the right to vote, recognizing that voting includes 'all action necessary to make a vote effective.' . . . Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way.

racial discrimination, *compare Eccles v. Gargiulo*, 497 F.Supp. 419, 422 (E.D.N.Y.1980) *and Beatty v. Esposito*, 439 F.Supp. 830, 832 (E.D. N.Y.1977) (requiring such allegations) *with Clayton v. North Carolina State Board of Elec-*

*tions*, 317 F.Supp. 915, 918 (E.D.N.C.1970) (three-judge court) (not requiring such allegations), this Court need not address the issue, in light of the conclusion that no section 5 changes occurred here.

*Allen v. State Board of Elections, supra,* 393 U.S. at 565–66, 89 S.Ct. at 831–32 (citations omitted). Without broad construction and vigilant enforcement of section 5, covered jurisdictions could perpetuate electoral discrimination by adopting new exclusionary devices as soon as the old ones were struck down. The cases reflect a consistent policy of requiring virtually any change affecting elections to pass through the preclearance process.

 This suit presents a different situation. Here, the covered jurisdiction (New York County) has enacted no new statutes and promulgated no new regulations; the formal election laws have been submitted to the Attorney General and have been cleared by him. Nor is this a *situation in which, notwithstanding the for-mal statutes, the state has de facto sup-planted those laws with different proce-dures.*[5] Rather, the present situation is one in which defendants have purportedly acted in violation of precleared election laws that remain in full force. The alleged miscon-duct of these local election officials does not constitute a "change" for purposes of sec-tion 5.

Section 5 refers to changed practices that a subdivision "enacts" or "seeks to adminis-ter." These words connote at least some

volitional action on the part of the state. Here, concededly, no enactment has oc-curred. Nor has New York County sought to administer procedures different from those prescribed by the Election Law. The complaint merely alleges that some local officials have violated the law in the 71st Assembly District. This is insufficient to implicate section 5.

Requiring preclearance must serve some rational purpose. It would be pointless to require the state to seek approval for prac-tices that it condemns and that it has no desire to enact or administer. Plaintiff does not—and could not plausibly—suggest that the state desires to adopt a procedure whereby, for example, the number of votes recorded on the machine exceeds the num-ber of voters who sign in at that polling place. *See* Complaint ¶ 32.

 To deny that plaintiff's allega-tions constitute a section 5 change is not to leave him remediless. The courts of New York have jurisdiction to hear complaints that election officials have violated its laws. Such claims may be raised in challenges to particular election results, or more broadly in suits seeking injunctive relief.[6] Nowhere does plaintiff suggest that the courts of New York would fail to give his state-law claims a fair hearing.[7] Moreover, to the

---

5. Such a situation could constitute a violation of section 5. If, for example, a properly pre-cleared statute authorized assistance for illiter-ate voters, but the state subsequently decided not to allow any such assistance, that action would constitute a change for section 5 pur-poses, even though the defunct policy remained on the books. This is consistent with the stan-dard *advocated by the United States:*

[W]hen election officials or other persons clothed with the authority of the state admin-ister election procedures which are inconsist-ent with state law, the district court in a Section 5 enforcement action must determine whether the changed procedures amount to isolated conduct unattributable to the state or its political subdivision or whether the changed procedures were administered in a more widespread and systematic context and in a manner sanctioned, however indirectly, by the state. If the facts support the latter finding, it is our view that the changed prac-tices constitute a change within the meaning of Section 5 and should be submitted for the requisite federal review.

Memorandum on Behalf of the United States at 6 (footnote omitted). The government takes no position as to whether the complaint in this action satisfies its standard.

6. Plaintiff alleges that only a candidate may challenge voting irregularities under Election Law § 16–102. Complaint ¶ 35. But no barrier exists to suits by candidates or other citizens alleging repeated violations of state law by par-ticular individuals. Moreover, New York has criminal penalties for election fraud. *See* Elec-tion Law art. 17.

7. Plaintiff claims that, by delaying publication of results until the time for filing objections has nearly expired, defendants vitiate a candidate's right to contest voting irregularities. Com-plaint ¶ 36. But a candidate could force timely release of the information by way of manda-mus or injunction, or he could request that the court grant additional time to mount a chal-lenge because of the officials' delay.

extent that he attributes defendants' action to racial animus, other provisions of the Voting Rights Act provide ample protection against discriminatory application of valid state laws. *See* 42 U.S.C. §§ 1971(a)(1), 1971(a)(2)(A), 1971(e), 1971(g), 1973, 1973f, 1973i(a). Therefore, while plaintiff may have valid grievances under New York law or under other sections of the Act, his complaint is insubstantial under section 5.

Although the Supreme Court has not addressed this particular issue, lower courts have, and their decisions are consistently in accord with this conclusion. In *United States v. Saint Landry Parish School Board, supra,* for example, the complaint alleged that a vote-buying and election-fraud scheme, involving local election officers and other officials, constituted a section 5 change. The District Court, without assembling two other judges, dismissed the section 5 claim for failure to state a cause of action; the Court of Appeals for the Fifth Circuit affirmed. The appellate court rejected the government's contention that the misconduct of local election officials amounted to a section 5 voting procedure.[8] The Court reasoned:

> [W]e conclude that these actions do not constitute a change that the state *has enacted or sought to administer within the meaning of that section.* . . . [O]ne would not normally conclude that a state "enacts or administers" a new voting procedure every time a state official deviates from the state's required procedures. The commonsense meaning of "shall enact" indicates that action of a state, *as a body,* is envisioned, and we think "shall seek to . . . administer" was added to cover situations when an enactment was not actually passed, but when a procedure was nonetheless widely administered with at least the implicit approval of the state governing authority. . . . But we can find no case which even hints that actions

of a state official which are in conflict with the state's required procedures should be considered a change in voting procedures enacted or administered by the state within the meaning of § 5 . . . . The approval requirements of § 5 compel this conclusion. Surely Congress did not intend the Attorney General and the district court for the District of Columbia to waste their time considering voting procedures that a state does not wish to enact or administer. But this would be the result if we required the state to submit for approval, as a new voting procedure, those actions of state officials which conflict with the state's required procedures.

We do not mean to intimate that state officials are free to violate approved state procedures and conduct an election in a discriminatory manner. Congress was well aware that such an abuse might occur, and it prohibited such action under other sections of the Voting Rights Act. . . . All we are saying is that this abuse is not one that § 5 was designed to alleviate.

601 F.2d at 864 (footnote omitted) (emphasis in original).

Other courts have agreed that misconduct of election officials does not constitute a section 5 change. *See, e. g., Beatty v. Esposito, supra,* 439 F.Supp. at 832; *Gordon v. Executive Committee,* 335 F.Supp. 166, 169–70 (D.S.C.1971) (three-judge court) (per curiam).[9] Similarly, several courts have held that allegations like plaintiff's must be resolved pursuant to other provisions of the Act, *see Webber v. White, supra,* 422 F.Supp. at 425–28, or by state courts, *see, e. g., Eccles v. Gargiulo, supra,* 497 F.Supp. at 422; *Gremillion v. Rinaudo,* 325 F.Supp. 375, 378 (E.D.La.1971).

The closest decision by the Court of Appeals for the Second Circuit is *Powell v. Power,* 436 F.2d 84 (2d Cir. 1970). An un-

---

**8.** The Court of Appeals also rejected the government's contention that a single judge may not dismiss a section 5 claim. 601 F.2d at 863.

**9.** In *Gordon,* for example, the misconduct alleged was permitting persons to vote in a primary despite their recent participation in another party's primary. The court held that this was not a section 5 change and that the three-judge court therefore lacked jurisdiction.

successful candidate, and voters, in a Democratic congressional primary alleged that election officials had permitted non-party members to vote in the primary, in violation of the Voting Rights Act and section 1983. The District Court denied relief, and the Court of Appeals affirmed. Without specifically addressing section 5, the Court of Appeals said of plaintiffs' Voting Rights Act claims:

> Were we to embrace plaintiffs' theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law....
> [W]e are not inclined to undertake such a wholesale expansion of our jurisdiction into an area which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts.

*Id.* at 86. *Cf. Beatty v. Dinkins, supra,* 478 F.Supp. at 751 ("this case appears to be a local election dispute which should be resolved by the state courts").

The Second Circuit's admonition is particularly apposite here. What plaintiff has conclusorily labelled as section 5 changes are no more than alleged violations of valid state laws, precleared by the Attorney General and still adhered to by New York State. These allegations are meritless under section 5 and do not justify convening a three-judge court. Those portions of the complaint alleging violation of section 5 of the Voting Rights Act are dismissed with prejudice. Fed.R.Civ.P. 12(b)(6).

SO ORDERED.